**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

FOKISS, INC. d/b/a STEW PETERS NETWORK
    *PLAINTIFF*

V.                                       **CASE NO.: 2:24-cv-14096**

TLM GLOBAL, LLC; TLM VISION, INC.;
EDWARD SZALL; LAUREN WITZKE;
MATTHEW SKOW and
NICHOLAS STUMPHAUZER
    *DEFENDANTS*

## COMPLAINT

    Plaintiff, FOKISS, INC. D/B/A STEW PETERS NETWORK ("Plaintiff"), by and through its undersigned counsel, brings this action against Defendants, TLM GLOBAL, LLC; TLM VISION, INC.; EDWARD SZALL; LAUREN WITZKE; MATTHEW SKOW; and NICHOLAS STUMPHAUZER, for injunctive relief, declaratory relief, and damages, and in support thereof, alleges the following:

### <u>PARTIES</u>

1. Plaintiff is a Corporation registered in the State of Minnesota with a principal address of 656 Hallstrom Drive, Red Wing, MN 55066. Plaintiff also has a current pending Application by Foreign Corporation for Authorization to Transact Business in Florida, attached hereto and incorporated herein as **Exhibit A**, with the Florida Secretary of State.

2. TLM Global, LLC ("TLMG") is a Florida Limited Liability Company with a principal address of 2046 Treasure Coast Plaza, Suite A #138, Vero Beach, FL 32960.

3. TLM Vision, Inc. ("TLMV") is a Florida non-profit Corporation with a principal address of 2046 Treasure Coast Plaza, Suite A #138, Vero Beach, FL 32960.

4. Upon information and belief, Defendant Edward Szall (hereinafter referred to as "Szall") is an individual residing at 1356 2nd Road SW, Vero Beach, FL 32962.

5. Upon further information and belief, Szall, at all times pertinent to the facts and allegations of this Complaint and still to this day, is the managing member and a principal of TLMG and a Board member of TLMV.

6. Upon information and belief, Defendant Lauren Witzke (hereinafter referred to as "Witzke") is an individual residing at 1700 Aynsley Way, Vero Beach, FL 32966.

7. Witzke, for the majority of time pertinent to the facts and allegations of this Complaint, was a high-level employee of Plaintiff.

8. Upon further information and belief, Witzke, at all times pertinent to the facts and allegations of this Complaint and still to this day, is a principal of TLMG and a Board member of TLMV.

9. Upon information and belief, Defendant Skow (hereinafter referred to as "Skow") is an individual residing at 5925 Carriage Lake Court, Vero Beach, Florida, 32968.

10. Upon further information and belief, Skow, at all times pertinent to the facts and allegations of this Complaint and still to this day, is a principal of TLMG and a Board member of TLMV.

11. Upon information and belief, Defendant Nicholas Stumphauzer (hereinafter referred to as "Stumphauzer") is an individual residing at 58 Pleasant Pond Loop, Hattiesburg, MS 39402.

12. Upon information and belief, Stimphauzer, at all times pertinent to the facts and allegations of this Complaint, was a resident of Vero Beach, FL and has moved to Mississippi in and around the beginning of 2024.

13. Upon further information and belief, Stumphauzer, at all times pertinent to the facts and allegations of this Complaint, was a principal of TLMG and, as of this date, is a Board member of TLMV.

14. The allegations within this Complaint are directed toward the Defendants, both individuals and entities, in various capacities. Due to the Defendants' intricate and interwoven relationships and roles within TLMG and TLMV, it is presently unclear which Defendant, in their respective capacity as an individual or as part of an entity, was the acting or non-acting party with respect to the specific allegations set forth herein.

15. The Plaintiff avers that the individual Defendants and the entity Defendants are so closely linked in their operations, governance, and activities relevant to this Complaint that distinguishing between their actions at this preliminary stage is impracticable. Therefore, for the sake of clarity and without prejudice to the Plaintiff's rights to seek discovery and further delineate the Defendants' respective roles and liabilities, the terms "TLM" or "Defendants" are used herein to collectively refer to all named Defendants.

16. The Plaintiff reserves the right to amend this Complaint as discovery progresses to specify the actions and liabilities of the individual Defendants and the entity Defendants more precisely. At this juncture, however, Plaintiff alleges that the actions attributable to TLM reflect the collective conduct and liability of the Defendants as intertwined and inseparable actors with respect to the claims presented.

17. It is the Plaintiff's contention that the complex interrelationship between the individual Defendants and the entity Defendants, and their collective actions under the umbrella of TLM have given rise to the claims herein. Such claims are directed against all Defendants, with the understanding that discovery may further illuminate the specific roles, responsibilities, and liabilities of each Defendant in relation to the allegations of this Complaint.

## JURISDICTION

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1131 and 1338 (a) and (b), because this case arises under the Copyright Act (17 U.S.C. §§ 101, *et seq.*) and the Lanham Act (15 U.S.C. § 1051, *et seq.*) of the United States.

19. This Court has subject matter jurisdiction over the federal and state common law claims, and the state statutory claims herein under 28 U.S.C. § 1338(b), because those claims are joined with a substantial and related claim under the Copyright Act (17 U.S.C. §§ 101, et seq.) and the Lanham Act (15 U.S.C. § 1051, et seq.) over which this Court has original jurisdiction.

20. This Court has supplemental jurisdiction over all of the claims pled under state law herein under 28 U.S.C. § 1367, because those claims are joined with, and are so related to Plaintiff's claims under the Copyright Act (17 U.S.C. §§ 101, et seq.) and the Lanham Act (15 U.S.C. § 1051, et seq.) which this Court has original jurisdiction, such that they form part of the same case or controversy under Article III of the United States Constitution.

21. This Court has *in personam* jurisdiction over TLMG, TLMV, Szall, Witzke, and Skow in this action and venue in this judicial district is just and proper pursuant to 28 U.S.C.

§1391(b)(1) because each Defendant resides in this judicial district. Further, substantial parts of the events or omissions giving rise to the claims herein occurred in this district.

22. This Court has *in personam* jurisdiction over Stumphauzer in this action pursuant to Fed. R. Civ. P. 4(k)(1)(A) and by and through Florida's Long Arm Statute, Fla. Stat. § 48.193(1)(a)(1), (2), and (7), as well as §48.193(2) and venue in this judicial district is just and proper pursuant to 28 U.S.C. § 1391(b)(1) because Stumphauzer was a resident of this judicial district at all times pertinent to this claim. Furthermore, this Court has *in personam* jurisdiction over Stumphauzer in this Action pursuant to 28 U.S.C §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims against Stumphauzer occurred in this district.

## BACKGROUND AND FACTS PERTINENT TO ALL COUNTS

### *RELATIONSHIP AND RESPONSIBILITIES OF THE PARTIES*

23. Plaintiff is a digital media organization providing an array of different digitally-streamed media content such as online broadcasts/podcasts, documentaries, news and analysis, and live events (altogether, the "Network").

24. TLMG is a media production outfit. Its primary service is to assist in the production of media content for its clients.

25. In and around October 2021, Plaintiff engaged with TLMG to produce its Network.

26. Plaintiff and TLMG did not enter into a formal written agreement or scope of work regarding their business relationship, however, there was an oral agreement that:

    a.   TLMG would assist in the production, editing, posting, and monetization of Plaintiff's Network and each show on the Network;

    b.   TLMG would assist with creating, maintaining, and posting content on Plaintiff's social media handles and other video-hosting platforms (together, subsections (a) and (b) of this Paragraph shall hereinafter be referred to as "Network Production"); and

    c.   TLMG would assist in the production of the Network's documentaries (hereinafter, TLMG's services allocated to the production of documentaries shall be referred to as "Documentary Production").

27. There was an agreed-upon budget for all services/work TLMG provided to Plaintiff.

28. Payments made by Plaintiff to TLMG were allocated separately to either Network Production services or Documentary Production services.

29. Plaintiff would pay TLMG weekly for services provided toward Network Production (the "Weekly Payment").

30. The Weekly Payment contemplated TLMG's services for all Network content, including all the Network's various online broadcasts/podcasts and social media posting, except for documentaries.

31. Plaintiff would pay TLMG in a lump sum for Documentary Production.

32. Each documentary that was produced by TLMG for Plaintiff had a set pre-determined budget.

33. From October, 2021 through early April, 2022, Plaintiff and TLMG had a good working relationship; TLMG provided the weekly Network Services and Plaintiff made timely Weekly Payments.

34. In and around that same time, Plaintiff directed TLMG to assist in the production of its first documentary, "Watch the Water."

35. Plaintiff and TLMG agreed on a budget and timeline for the production and release of Watch the Water.

36. Watch the Water was released on April 11, 2022.

37. Watch the Water was a successful documentary for Plaintiff and has been viewed by approximately 17 Million people on the Network's Rumble channels alone, see below:





38. Watch the Water significantly grew the Network's followers and fanbase.

39. Plaintiff currently holds a Copyright Registration for the entire Watch the Water work, United Stated Copyright Registration No. PA0002460649.

40. The production of Watch the Water, and as described more fully below, the majority of the documentaries that TLM assisted the Network in producing, is a good example and representation of the parties' understanding of the material terms relative to Documentary Production and the agreed-upon ownership and rights in films and content produced between the parties.

### *GOLDCO SPONSORSHIP*

41. Plaintiff's primary business model centers around selling advertisement/sponsorship spots on its Network to third-party advertisers/sponsors.

42. With the release of Watch the Water, the growing fan base, and amount of followers to its Network, the Network was able to secure more sponsorships.

43. On April 28, 2022, Plaintiff entered into a sponsorship agreement with GoldCo (the "GoldCo Sponsorship Agreement"), a company that provides services in the precious metals industry.

44. Pursuant to the GoldCo Sponsorship Agreement, GoldCo and Plaintiff worked out an annual budget for GoldCo's sponsorship of the Network.

45. Pursuant to the GoldCo Sponsorship Agreement, Plaintiff had certain requirements it had to meet such as mentioning GoldCo as a sponsor throughout its Network and also producing and releasing a certain amount of documentaries during each GoldCo Sponsorship Agreement contractual term.

46. The initial GoldCo Sponsorship Agreement term commenced on April 28, 2022 and ended on April 28, 2023 (the "Initial Term").

47. Since the Initial Term, Plaintiff and GoldCo have renewed the GoldCo Sponsorship Agreement for a second term (the "Second Term"), which commenced on April 28, 2023 and is set to expire on April 29, 2024.

48. While GoldCo is not a party to this action, the GoldCo Sponsorship Agreement is a vital piece to the relationship, duties, and responsibilities of the parties hereto because the GoldCo Sponsorship Agreement, and the requirements therein, provided the majority of the Network's annual budgets and production requirements.

49. TLM, at all times relevant hereto, was aware of the production obligations Plaintiff had/has to GoldCo.

50. Plaintiff was relying on TLM to assist it in fulfilling the GoldCo Sponsorship Agreement terms and obligations.

51. In fact, TLM and its employees, principals, and agents, were part of the negotiations with GoldCo for the Initial Term and assisted in finalizing annual budgets and annual obligations.

52. Moreover, Witzke was a top-level employee of Plaintiff and a principal of TLMG at the time the GoldCo Sponsorship Agreements were negotiated and executed.

53. Both Plaintiff and TLMG understood that their Agreement regarding Network Production and Documentary Production and the obligations therein were generally tied to the Plaintiff's obligations to the GoldCo Sponsorship Agreement because GoldCo provided the majority of the budget for the production of the Network and also because the GoldCo Sponsorship Agreement had strict requirements regarding the number of documentaries that would be released by Plaintiff in each contract term.

### THE "DIED SUDDENLY" DOCUMENTARY AND MEDIA FRANCHISE

54. The third documentary, which is the subject of Plaintiff's intellectual property claims herein, that Plaintiff hired TLMG to assist in producing, was called "Died Suddenly" (when referring to the documentary and its content as a motion picture and piece of audiovisual work, it will be referred to as the "Film").

55. The Film is a documentary about the apparent health issues and risks associated with COVID-19 vaccines.

56. Plaintiff is implementing a plan to center a media franchise around the Film and its title "Died Suddenly" to include a sequel and a series of daily news updates and commentary to the Died Suddenly viewers and fanbase through Plaintiff's website, www.StewPeters.com (the "Genuine Website") and its social media X handle (www.X.com f/k/a www.Twitter.com), namely "@DiedSuddenly_" (the "X Handle") as shown below:



57. The X Handle was originally set up in and around October, 2022 by TLM and/or its contractors, at Plaintiff's direction, to assist in promoting and building awareness of the Film as well as providing consistent news updates and commentary to the followers of the X Handle and viewers of the Film and any sequels.

58. Consistent with the Network Production and Documentary Production that TLM was to provide Plaintiff pursuant to the parties' agreements, Plaintiff required that TLM and/or its

contractors would post to the X Handle to promote the film, air trailers of the film, and disseminate the pertinent updates, news, and commentary regarding alleged COVID vaccine deaths.

### *DiedSuddenly.Info*

59. In and around that same time, the Defendants suggested to Plaintiff that a website domain should be set up, separate and apart from the Genuine Website, solely for the purpose of assisting in promoting the Film and also to provide information to the general public regarding the Film.

60. Plaintiff agreed with Defendants' suggestion and on or about September 26, 2022, the Defendants set up www.DiedSuddenly.info (the "Info. Site") for Plaintiff.

61. Consistent with the Network Production and Documentary Production, the Defendants were to only post authorized content, information, and trailers regarding the Film to the Info. Site.

62. At the Info. Site's inception, its function was to inform future viewers of the Film of its release date and pertinent information. A copy of the Info. Site's home page from October 21, 2022, taken from The Internet Archive's Way Back Machine (www.archive.org/web/) can be found below:



63. The content on the Info. Site as of October 21, 2022 was authorized by Plaintiff.

64. When the X Handle and Info. Site were initially created, Plaintiff and TLM had a good working relationship built on trust and prior performance and course of dealings.

65. When the X Handle and the Info. Site were initially created, Plaintiff put its trust in TLM to have its Network's best interests in mind and as a priority regarding the content that was posted to both.

66. As Plaintiff now regrets, but because of the relationship between the parties, at all times material hereto, the Defendants had, and still have to this day, sole ability to post and control the X Handle and the Info. Site.

67. However, the X Handle and Info. Site, as will be described more fully below, has since been hijacked by TLM and converted by the Defendants and the Defendants have withheld access and control over both the X Handle and Info. Site from Plaintiff.

68. With creative input and direction from Plaintiff, TLM and its agents, principals, and/or contractors assisted in the production of the Film.

69. The agreement between Plaintiff and TLM for the production of the Film was the same as the production of Watch the Water, pursuant to the parties' agreement regarding Documentary Production.

70. The Plaintiff first used the Film's title, "Died Suddenly" (hereinafter, the title to the Film and the media franchise in whole will be referred to as "Plaintiff's Mark"), in interstate commerce, on October 6, 2022 (the "First Use Date") when it posted initial sneak peek trailers of the Film on the Stew Peters Network's Rumble.com page (@Stew Peters Network) (hereinafter the "Rumble Page") and the Network's Gettr.com page (@Real Stew Peters) (hereinafter the "Gettr Page") (the trailers released to the general public on the

Rumble Page and Gettr Page will be hereinafter referred to as the "First Use"). Screenshots of the Rumble Page and Gettr Page posts are attached hereto and incorporated herein by reference as **Exhibits B and C**, respectively.

71. The Network also promoted the Died Suddenly Film by releasing a trailer of the Film on the First Use Date on the Stew Peters Show, which was broadcast on the following platforms where the Network has profiles and/or pages:

    a.   Genuine Website;

    b.   The Network's Rumble channels (the "Rumble Channels");

    c.   The X Handle;

    d.   Firestick;

    e.   AppleTV;

    f.   ROKU;

    g.   Apple Podcast;

    h.   Gettr.com;

    i.   <u>BEK TV; and</u>

    j.   <u>Cozy Tv (all together, the mediums and/or platforms named in Paragraphs 72(a) through 72(j), will be referred to as the "Film's Distribution Channels").</u>

72. On the First Use Date, the Stew Peters Show had an estimated audience reach of approximately two (2) million, taking into account all platforms the Network's content is aired on.

73. The full Film was released November 21, 2022 (the "Release Date") on the Film's Distribution Channels.

74. From the First Use Date to the Release Date, Plaintiff promoted the Film and Plaintiff's Mark approximately 130 times on Plaintiff's Telegram, Gab, GETTR, Truth Social, and X Handle accounts alone; this list is not exhaustive.

75. From the First Use Date to the Release Date, Plaintiff also promoted the Film and Plaintiff's Mark on the Stew Peters Show, which airs every weekday, amounting to approximately an additional 32 times the Film and Plaintiff's Mark was promoted.

76. TLM assisted in the production and promotion of the Film and use of Plaintiff's Mark in nearly each of the above-mentioned uses and promotions by either posting a trailer to Plaintiff's social media handles, producing new trailers and content to be aired on the Stew Peters Show or social media profiles, or by coming on the Network as guests/interviewees to provide the Network's audience with updates and status on the production of the Film.

77. At all times pertinent hereto, TLM and its agents, principals, employees and/or contractors knew, or should have known, that Plaintiff owned, held, and retained exclusive rights to the Film and its title.

78. The Stew Peters Show that aired on November 4, 2022 is just one example of many, clearly showcasing this understanding of the parties. On November 4, 2022, Witzke sat in for Mr. Stew Peters on his show as the main anchor to host the show in his absence.

79. On this Stew Peters Show, Witzke interviewed Skow and Stumphauzer to assist in promoting the Film and providing the Network's audience an update on its production and release, see below (pictured in the below screenshot of Skow (left) and Stumphauzer (right)):



80. At all times relevant hereto, the full Film was to be exclusively on the Film's Distribution Channels.

81. Plaintiff used, and uses, the Film's Distribution Channels as designated pages for the Film.

82. The Film was aggressively promoted by Plaintiff on the Film's Distribution Channels.

83. The Film found virality immediately upon its release.

84. In fact, after just a couple of days of the Release Date, the Film had been viewed by millions across the United States and the World and was steadily gaining more and more traction.

85. Unfortunately, it was this virality that the Defendants sought to take advantage of and capitalize on.

86. After the Film had been released to the public for just one week, without Plaintiff's authority, direction, consent, or knowledge, the Defendants started making material changes to the Info. Site and the X Handle.

87. As of November 30, 2022, the Info. Site started to seek donations from website traffic, see below:



88. At no time has Plaintiff ever sought, or authorized the Defendants to seek, donations for its documentaries.

89. The changes made to the Info. Site as of November 30, 2022 were done without Plaintiff's consent, authority, direction, or knowledge.

90. Any monies accepted by the Info. Site as a donation were never provided to Plaintiff and Plaintiff had no knowledge of any monies received or solicited until recent months.

91. Thereafter, without Plaintiff's authority, consent, or knowledge, the Info. Site underwent further changes. As of January 13, 2022, the Defendants continued to solicit donations from website traffic on the Info. Site but also started representing to donors they would be named producers a sequel to the Film, Died Suddenly 2.

16

92. As mentioned above, Plaintiff has never authorized or given any consent to Defendants to seek donations.

93. Plaintiff has also never authorized Defendants to promise any donors that they would be named producers in any sequel to the Film (the "Sequel").

94. Furthermore, and more importantly, Plaintiff never entered into any Documentary Production agreement for the Defendants to produce the Sequel.

95. While Plaintiff does intend to release a Sequel to the Film, Plaintiff will not seek TLM's assistance in its production.

96. A copy of the Internet Archive's Way Back Machine snapshot of the Info. Site as of January 13, 2023 can be found below:



97. As of present date, the Info. Site depicts Skow and Stumphauzer as "Directors" of the Film and also incorrectly claims that "…they released the global phenomenon "*Died Suddenly.*" See **Exhibit D** attached hereto and incorporated herein by reference.

98. The use of Skow's and Stumphauzer's name and image on the Info. Site, along with the language that they "released" the Film, coupled with the fact that the Info. Site is currently void of any indication or connection to the rightful owner of the Film or the Mark, is inherently confusing and misleading to those who travel to the Info. Site.

99. The Info. Site also continues to solicit donations to "Become a Producer" of the Sequel to the Film, "Died Suddenly 2."

100. The Info. Site states:

BECOME A PRODUCER

*"Donations to the production of Died Suddenly 2 will be identified as producer credit, and your name will be included in the names of producers at the end of the film. If you would prefer to immortalize your injured or deceased loved one on the film, you are welcome to submit their name instead and let us know of the substitution via email."*

A screenshot of the pertinent section of the Info. Site is attached hereto as **Exhibit E** and incorporated herein by reference.

101. Upon information and belief, any and all donations received from the Info. Site have been directed toward a bank account owned by TLMG, TLMV, and/or an account or accounts owned and controlled by one or more of the individually named Defendants.

102. As mentioned, Plaintiff has never provided any of the Defendants with authority or consent to seek donations to assist in the production of the Film or any of its documentaries, to promise donors be a named producer, or to promote the production or release of the Sequel.

103. Further, and as mentioned, while Plaintiff does intend on releasing the Sequel, there is no agreement between Plaintiff or any of the Defendants to produce the Sequel and Plaintiff has no intentions of having any of the Defendants assist in its production.

104. Nevertheless, TLM and/or Skow and Stumphauzer represent on the Info. Site that they are currently in the production of Died Suddenly 2 and that the Sequel will be released in 2023, see below:



105. The language used on the Info. Site stating that "…Directors Matthew Skow and Nicholas Stumphauzer are in pre-production now on a sequel…" is misleading, a misrepresentation, and confusing as to the ownership of the Film, the originator of the Mark, and TLM's current role with the Network and the production of the Sequel.

106. Further, Died Suddenly 2 was not released in 2023 and is not currently in active pre-production, thereby tarnishing the goodwill Plaintiff has obtained in the Mark to date.

107. The plaintiff does not seek any payment from viewers for watching any of its documentaries.

108. Plaintiff also does not seek donations from viewers for assistance in the production of any of its documentaries.

109. Plaintiff believes that the information contained in its documentaries is vital to the general public and has made a strong stance against putting said vital information behind paywalls.

110. TLM and/or Skow and Stumphauzer, knew, or should have known, that they did not have the authority to make the above-referenced representations and solicitations on the Info. Site.

### *THE X HANDLE*

111. As mentioned above, the X Handle was originally set up, at Plaintiff's direction, to assist in promoting and building awareness of the Film, releasing trailers of the Film, releasing the full version of the Film, and importantly, for the purpose of providing consistent updates and news to the followers of the X Handle and viewers of the Film.

112. Because there was mutual trust between the Parties, coupled with the fact that Witzke was the Network's Executive Producer and principal of TLMG, when the X Handle was first created, Plaintiff did not require that it have administrative access to the X Handle or that the X Handle be tied to a particular Network email address to be able to quickly institute override controls over the X Handle.

113. Plaintiff and TLM knew that the X Handle was made for the Network, was owned by the Network, and that Plaintiff had sole authority regarding content that would be posted on the X Handle.

114. Since its creation, the X Handle has grown to amass over 690,000 followers (the "X Handle Followers"), a substantial audience.

115. Upon information and belief, because of the virality of the Film and the growing follower base to the X Handle, the Defendants sought to also leverage and capitalize on the use of the X Handle for their own gain.

116. Without consent, authority, or direction from Plaintiff, TLM started using the X Handle to direct all X Handle Followers to the unauthorized content on the Info. Site:



117. Further, TLM, without authority, direction, or Plaintiff's approval, has pinned an unauthorized post to the top of the 2,644 X Handle posts:

    a.  Directing the X Handle Followers to the Info. Site where they are actively seeking donations;

    b.  Representing to X Handle Followers that the Sequel is in production; and

    c.  Seeking financial support from the X Handle Followers on the Info. Site, see below:



118. Upon information and belief, TLM, without direction, authority, or Plaintiff's consent, has also set up a subscription to the X Handle.

119. Upon information and belief, as of at least January 21, 20224, TLM, without direction, authority, or Plaintiff's consent, is using the X Handle to solicit $5.00 monthly subscription payments from the X Handle Followers as seen below:



120. The above-shown January 21, 2024 post has never been authorized by the Plaintiff.

121. Plaintiff has never provided any consent or authority to TLM to post any X Handle posts seeking donations, subscriptions, directing X Handle Followers to the unauthorized content on the Info. Site, or communicating an alleged production of the Sequel.

### *THE EXTENT OF THE FILM'S VIRALITY AND RECOGNITION*

122. The Film has had massive success and has been viewed by approximately 19.5 million viewers on the Rumble Channels alone, see below:



123. On the X Handle, the Film has been viewed by approximately <u>3.9 million viewers.</u>

124. The Film has also been viewed by an estimated hundreds of thousands of people on the Genuine Website and other Film Distribution Channels.

125. The X Handle Followers associate the X Handle with Plaintiff, as it is well known that the Film is Plaintiff's production. In fact, the Film's content itself highlights that it is a Stew Peters production.

126. TLM is using the secondary meaning of Plaintiff's Mark and the goodwill Plaintiff has built in Plaintiff's Mark and to the Film to hoodwink the X Handle Followers into thinking that the posts, representations, and solicitations on the X Handle are all being posted by, or with approval of, Plaintiff.

127. Those who travel to the Info. Site and the X Handle, and those who have been solicited for donations or subscriptions, under the Mark, are being misled into believing that Plaintiff has endorsed the Info. Site and certain X Handle posts.

128. TLM has ignored Plaintiff's demands to transfer administrative access and ownership in the X Handle and Info. Site to Plaintiff and have ignored Plaintiff's demands to take down the unauthorized posts and solicitations.

### DEFENDANTS' IMPROPER INTELLECTUAL PROPERTY APPLICATIONS AND
### REGISTRATIONS

129. One day after starting unauthorized donation solicitations on the Info. Site, TLMG, without any authority, direction, or consent from Plaintiff, and without Plaintiff's knowledge, filed an 'intent-to-use' service mark application on December 1, 2022 for the mark "Died Suddenly" (the " Defendant's Mark").

130. TLMG's application for the Defendant's Mark is currently in "pending" status with US Serial Number 97699848 and seeks registration in International Class 41 and US Classes 100, 101, and 107 for:

> *"Entertainment services in the nature of production of television and movie series, featuring live action, documentary, horror, comedy, drama, and suspense; Entertainment services, namely, multimedia production services; Entertainment services, namely, providing podcasts in the field of news films and documentary; Entertainment services, namely, providing video podcasts in the field of news films and documentary; Film and video film production; Multimedia entertainment services in the nature of recording, production and post-production services in the fields of music, video, and films; Production of podcasts; Multimedia entertainment services in the nature of development, production and post-production services in the fields of video and films."*

> A copy of the TESS printout from the USPTO's records is attached as **Exhibit F** hereto and incorporated herein by reference.

131. Plaintiff, however, is the true and rightful owner of the Mark.

132. In and around the same time that TLMG submitted a trademark application for Defendant's Mark, it also, without any authority, direction, or consent from Plaintiff, and without Plaintiff's knowledge, applied for Copyright registration with the United States Copyright Office ("USCO") for the Film.

133. Without any cause to deny such an application, the USCO granted TLMG Copyright Registration on February 3, 2023. A copy of a printout from the United States Copyright

Office's Public Catalog is attached hereto as **Exhibit G** and incorporated herein by reference.

134. Plaintiff, however, is the true Copyright owner for the Film and has exclusive rights to Plaintiff's Mark and the Defendant's Mark (together, because Plaintiff's Mark and Defendant's Mark is exactly the same, when referring to the title generally, Plaintiff will refer to it as the "Mark").

135. Upon information and belief, Defendants had full knowledge of Plaintiff's rightful ownership of the Copyright to the Film and ownership of the Mark when they applied for their Copyright to the Film and Trademark in Defendant's Mark.

136. The Defendants did not, and do not, possess any right to use the Mark, the Copyright, or to disseminate the Film.

137. Plaintiff never conferred upon any of the Defendants permission to use or apply for trademark protection of the Mark, use the Mark in an unauthorized way, claim or represent themselves as having any ownership in the Copyright or the Film, disseminate the Film through any channels other than the Film's Distribution Channels, or use the Mark to seek monetary contributions of any kind.

138. Still to this day, TLMG has never communicated to Plaintiff their actions in applying for a trademark on the Mark or copyright protection for the Film. These actions were only uncovered recently by Plaintiff's own investigations.

### *PLAINTIFF'S TERMINATION OF SERVICES WITH TLM*

139. Upon finding out about the Defendants' wrongful, deceptive, fraudulent, and infringing actions, Plaintiff decided to terminate any ongoing Network Production with TLM.

140. Plaintiff caused a Termination Letter ("Termination Letter") to be sent to TLM on or about January 27, 2024. A copy of the Termination Letter is attached hereto as **Exhibit H** and incorporated herein by reference.

141. In the Termination Letter, Plaintiff writes:

> *"Another area of concern is the ownership confusion of the "DIED SUDDENLY" name, twitter page, and documentary. The name is being used for unapproved postings, fundraisers, and even subscription sign ups. The fact that we found out on our own instead of through communication with yourself or another partner of TLM that you have applied for a TM and Copyright for a production we own is unacceptable. You were emailed a letter that you chose not to respond to regarding this matter. Sadly, however, this is not the only way we have been taken advantage of, in one way or another, through our shared relationship. Criminal to say the least."* See **Ex. H.**

142. In the Termination Letter, Plaintiff canceled all Network Production by TLM as of January 27, 2024.

143. Plaintiff did not, however, cancel or terminate the Documentary Production toward the Second Term of the GoldCo Sponsorship Agreement, primarily and principally because TLM had already been paid in full for its production (as described more fully below).

144. TLMG responded to the Termination Letter on February 5, 2024 (the "Response Letter"), a copy of which is attached hereto as **Exhibit I** and same is incorporated herein by reference.

145. What has become an apparent pattern of the Defendants, the Response Letter completely disregards Plaintiff's concerns and allegations regarding the intellectual property issues with the Film and Plaintiff's Mark.

146. In fact, the Response Letter only asserts an anticipatory repudiation defense by the Defendants regarding the production of an entirely different documentary that the Defendants have already been paid for, as will be described more fully below in a more appropriate section and fact pattern of this Complaint.

147. Thereafter, Plaintiff caused a formal Cease & Desist (the "C&D") demanding that TLM cease and desist all wrongful conduct pertaining to the Film, the Mark, and Copyright, to be sent in response to the Response Letter on February 8, 2024, which is attached hereto as **Exhibit J** and incorporated herein by reference.

148. Thereafter, because it is still unclear to this day the internal governance of the Defendant-entities, the involvement of the named-individuals in their capacity, ownership, and responsibilities, and the internal contractual relationships of the Defendants, Plaintiff caused another Cease and Desist letter, with substantially the same substance and claims as the C&D, to be sent to Skow, Stumphauzer, and TLMV on February 23, 2024 (the "Second C&D") (together, the C&D and the Second C&D will be referred to as the "C&D Correspondence"). The Second C&D is attached hereto as **Exhibit K** and same is incorporated herein by reference.

149. Plaintiff did carbon copy, via priority mail, a copy of the Second C&D to TLMG.

150. Both C&D Correspondence sought compliance to the infringing actions by February 28, 2024.

151. The Defendants have entirely ignored the Plaintiff's demands in the C&D Correspondence and have not remedied any of the infringing actions claimed by Plaintiff to date.

### *THE APRIL, 2024 DOCUMENTARY*

152. As referred to briefly above, the Defendants' Response Letter did not contemplate a response to any of Plaintiff's intellectual property claims, but rather, asserted an anticipatory repudiation defense regarding a documentary the parties agreed to have produced on or before April 28, 2024.

153. Pursuant to the Second Term of the GoldCo Sponsorship Agreement, which, as mentioned above, is set to expire on April 28, 2024, Plaintiff is required to release three total documentaries.

154. Like the Initial Term, TLM and its principals, agents, employees and representatives, were part of the negotiations and finalization of the Second Term

155. Like the Initial Term, Witzke was both a high-level employee of Plaintiff and a principal of TLM during the negotiations and finalization of the Second Term.

156. Plaintiff and TLM agreed that TLM would assist in the production of all three Second Term documentaries as part of the Documentary Production.

157. Plaintiff and TLM agreed on a Documentary Production budget for the Second Term.

158. The Documentary Production budget that was agreed upon for TLM's assistance in the production of all three Second Term documentaries totaled Three Hundred Seventy-Nine Thousand Dollars ($379,000.00) (the "Documentary Budget").

159. The three documentaries that were to be produced by TLM for SPN during the Second Term were/are:

  d. Final Days (released May 31, 2023);
  e. Slave Nation (released February 5, 2024); and
  f. TBD documentary to be produced on or before April 28, 2024.

160. Like Watch the Water and the Film, all parties knew that the Second Term's documentaries, including their content and titles, were to be exclusively owned by Plaintiff.

161. Plaintiff currently holds the Copyright Registration for the entire Final Days work, United States Copyright Registration No. PA0002460653.

162. Plaintiff currently holds the Copyright Registration for the entire Slave Nation work, United States Copyright Registration No. PA0002460655.

163. To date, Plaintiff has paid TLM the Documentary Budget in full as follows:

    g. $190,000.00 paid to TLM in May, 2023 and

    h. $189,000.00 paid to TLM in November, 2023.

164. Importantly, Szall, a TLM principal, has indicated in email correspondence to Plaintiff that he considers the Documentary Budget to be fully paid.

165. In an email dated November 17, 2023, Szall wrote to Plaintiff:

> "*Hey Stew,*
>
> *Regarding the $194,500 wire transfer you sent to TLM on November 9th, in good faith, we consider that full payment toward the two documentaries…*" See November 17, 2023 email attached hereto as **Exhibit L** and incorporated herein by reference.

166. The "two documentaries" Szall is referring to in his November 17, 2023 email are the two documentaries that had still not been released/produced at the time of his email, which are Slave Nation and the documentary that is supposed to be released on or before April 28, 2024.

167. Plaintiff has fully satisfied its obligations under the parties' agreement regarding the Second Term Documentary Production budget.

168. Szall's correspondence on November 17, 2023 further solidifies this fact.

169. However, TLM's Response Letter claims that Plaintiff's Termination Letter "…manifests an anticipatory repudiation of the entire contract. You may not piecemeal together the provisions for which you expect continued performance while at the same time repudiating your responsibility for continued payment" and that "…Continued performance in

furtherance of producing said documentaries was contingent upon continued weekly production payments through April, 2024." *See* **Ex. I.**

170. The Response Letter fails to recognize the fact that the parties had separate payment agreements for the Network Production, which was paid by the Weekly Payments, and the Documentary production, which was paid in lump sums for pre-budgeted allotments.

171. To date, TLM has been paid the full Documentary Production budget for all three Second Term documentaries, but has only produced and delivered two of the three documentaries.

172. TLM's Response Letter is clear communication of its unwillingness to perform the Second Term Documentary Production and further to retain payment for services that have not been provided to Plaintiff.

173. Plaintiff is entitled to a return of a third (1/3) of the Documentary Budget, totaling One Hundred Twenty-Six Thousand Three Hundred Thirty-Three Dollars and thirty-three cents ($126,333.33).

### *PLAINTIFF'S INTELLECTUAL PROPERTY APPLICATIONS*

174. On March 20, 2024, Plaintiff filed with the United States Patent and Trademark Office ("USPTO") an actual use Federal Trademark Application, *Serial No. 98459279*, for the Mark ("Plaintiff's Mark") in International Class 041 (U.S. Classes 100, 101, and 107) for:

> *"Entertainment services, namely, the provision of continuing segments featuring news delivered by television, radio, satellite, and the internet; Entertainment services in the nature of a series of public-health films."*

A copy of the application record culled from the USPTO website records is attached hereto as **Exhibit M** and incorporated herein by reference.

175. As mentioned above, Plaintiff's First Use of Plaintiff's Mark was on October 6, 2022.

176. Since the First Use, Plaintiff has used Plaintiff's Mark and extensively promoted the media franchise and the Film through its Network and the Film's Distribution Channels, which is viewed by hundreds of thousands of people in the United States and worldwide.

177. Plaintiff has continuously used Plaintiff's Mark throughout the State of Florida, the United States, and various other countries since the First Use, from which date Plaintiff began developing and building goodwill in Plaintiff's Mark.

178. Plaintiff expended significant efforts and resources in creating, producing, publishing, marketing, advertising, and promoting the Film under Plaintiff's Mark, such that the consuming public associates Plaintiff and Plaintiff's Mark, as a single source of the Film, the Mark, and the media franchise.

179. In the minds of the significant number of Plaintiff's viewers, followers, and listeners, the title comprising Plaintiff's Mark is associated with a single source of the Film, the Plaintiff.

180. On Rumble Channels and X.com alone, approximately 23.4 Million people have watched the Died Suddenly documentary on Network channels and/or profiles.

181. Plaintiff's Mark has obtained secondary meaning in the marketplace and consumers associate Plaintiff's Mark with Plaintiff only.

182. The way the Defendants have used, and are using, "Died Suddenly" is causing, and will continue to cause, confusion in the marketplace.

183. Plaintiff has received no compensation for the unauthorized use of the Mark or Film in connection with Defendants' infringing acts.

184. Each Defendant has either directly engaged in the complained of acts, contributed to same, induced same, or acted with knowledge that the other Defendants or third parties would violate one or more of the Plaintiff's rights.

185. As a direct and proximate result of the complained of acts, Plaintiff has suffered great and irreparable harm, including loss of good will, dilution, economic damage and lost profits. That harm escalates each day Defendants' acts are permitted to continue.

186. The balance of the equities and harm favor preliminary and permanent injunctive relief.

187. Plaintiff has no adequate remedy at law to prevent the complained of acts from continuing.

188. The injunctive relief requested herein is in the public interest.

189. Defendants' acts alleged herein were willful, malicious, knowing, wanton, reckless, and/or grossly negligent.

190. Importantly, TLM has not sought to Trademark any of the other documentaries it has assisted the Network in producing, nor sought Copyright registration for any of the other documentaries it has assisted Plaintiff in producing.

191. Besides the Film, the Defendants have assisted the Network, pursuant to the Documentary Production services agreement between the parties, in producing:

    a.  **Watch the Water**, as mentioned above;

    b.  **These Little Ones,** which was released on August 1, 2022;

    c.  **Watch the Water II,** which was released on May 12, 2023;

    d.  **Final Days**, which was released on May 31, 2023; and

    e.  **Slave Nation**, which was released on February 5, 2024.

192. TLM has not sought to infringe on Plaintiff's rights and interests to any of the other Documentary Production documentaries, which is telling.

193. TLM has only sought to convert and infringe on the intellectual property of the Film and the Mark, which have been the most successful and far-reaching of all the other documentaries.

194. The parties past performance and course of dealings are an important factor when analyzing the Documentary Production services agreement.

195. Plaintiff has been forced to retain the undersigned law firm as a direct result of the complained of acts of Defendants, and is obligated to pay them a reasonable fee for their services in connection with this action and any related actions.

## COUNT I

**FEDERAL UNFAIR COMPETITION, FALSE ENDORSEMENT, AND
FALSE DESIGNATION OF ORIGIN
15 U.S.C. §1125(a)**

196. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 195, as if fully set forth herein.

197. Plaintiff has been using the Mark in connection with the Film and other goods and services related to the Film since at least as early as the First Use Date and has developed substantial goodwill in the Plaintiff's Mark in Plaintiff's common law territory (at least the entire United States).

198. Plaintiff's Mark has become uniquely associated with, and thus is identified, only with Plaintiff.

199. The Defendants have improperly infringed on Plaintiff's Mark.

200. Defendants have knowingly caused their infringing acts, goods and/or services and/or use of the Mark to enter into interstate commerce with the designation "Died Suddenly" connected therewith.

201. This use of "Died Suddenly" by the Defendants is a false designation of origin which is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection,

or association of Defendants with Plaintiff, and as to the origin, sponsorship, or approval of such goods and/or services by Plaintiff.

202. The aforesaid acts, are in violation of §43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a), in that Defendants have used in connection with their goods and services a false designation of origin, a false or misleading description and representation of fact which is likely to cause confusion, and to cause mistake, and to deceive as to the affiliation, connection, or association of Defendants with Plaintiff and as to the origin, sponsorship, and approval of Defendants' representations, solicitations, goods and/or services and commercial activities by and with Plaintiff.

## COUNT II

### FEDERAL TRADEMARK DILUTION

203. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 202, as if fully set forth herein.

204. Died Suddenly, the Film, has been viewed by over at least 20 million (and likely more if taking into account people who viewed the film with others) individuals across the United States and the World.

205. The Network was awarded the American Liberty Awards in 2023 for their efforts and production of the Film as one of the recipients of the "Most Truthful Movie" award.

206. Died Suddenly, the X Handle, is followed by over 690 thousand X profiles and its news, commentary, and updates has been viewed across the United States and the World.

207. The Died Suddenly Film has been written about and commented on by major mediums and media, all linking the Film to either Mr. Stew Peters and/or the Network, such as the Anti-Defamation league, IMDb, the Associated Press, BBC News, and many other outlets.

208. The Died Suddenly Mark and media franchise is thus, famous.

209. Plaintiff is the true and rightful exclusive owner of the Mark.

210. As plead repeatedly above, once the Film and the Mark gained virality, the Defendants started to misuse and abuse its authorized use of the Mark and started to seek its/their own gain by use of the Mark.

211. The Defendants improperly and without consent, authority, or Plaintiff's knowledge, used the Mark in a commercial setting and for commercial gain by seeking donations and monetary subscriptions under the Mark and leveraging their unique control over the Network's Info. Site and X Handle.

212. The Defendants improper and unauthorized use of the Mark has caused dilution in the marketplace of the Mark and damages to Plaintiff.

## COUNT III

### FLORIDA COMMON LAW TRADEMARK INFRINGEMENT

213. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 212, as if fully set forth herein.

214. Through Plaintiff's extensive pre-release publicity efforts, coupled with the millions of people who have viewed the Film through the Film's Distribution Channels, and the followers of the X Handle news, analysis and commentary, the Mark is associated with Plaintiff as the source of the Film in the minds of consumers, and has thus achieved secondary meaning in Florida and throughout the United States.

215. Defendants' unauthorized use of the Mark in Florida is likely to cause consumer confusion, initial interest confusion, reverse confusion, mistake, or deception, in Florida, as to the source of various goods and services.

216. Defendant's unauthorized use of the Mark in Florida is also likely to cause consumer mistake and confusion   as to the connection, affiliation, relation, sponsorship or endorsement by Plaintiff, all of which irreparably have and continue to cause damage to Plaintiff.

217. By reason of the foregoing activities, Defendants, alone or in conjunction with their agents, servants, employees, principals, managers, contractors, attorneys, parents and subsidiaries, related companies, and all persons acting for, with, by, through or under them, have violated and infringed Plaintiff's rights in the Mark and has otherwise competed unfairly with Plaintiff, in violation of the common law of the State of Florida.

## <u>COUNT IV</u>

### FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### Fla. Stat. § 501.201-213, *et seq.*

218. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 217, as if fully set forth herein.

219. The factual and legal allegations contained herein against Defendants and their acts and omissions alleged herein amount to unfair and deceptive acts or practices under Fla. Stat. § 501.204.

220. The factual and legal allegations hereinabove regarding the Defendants' deceptive and wrongful actions, misrepresentations, scheme to defraud and omissions offend established public policy and are immoral, unethical and oppressive.

221. The deceptive and unfair acts and practices of the Defendants as described herein have caused Plaintiff damages.

222. Further, not only was Plaintiff damaged as a direct and proximate cause of Defendants' deceptive and unfair trade practices, but so were all the consumers, viewers, and listeners of the Film, Plaintiff's content, and viewers of the Info. Site and X Handle.

## COUNT V
## FLORIDA COMMON LAW UNFAIR COMPETITON

223. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 222, as if fully set forth herein.

224. Defendants, acting alone or in conjunction with their agents, servants, employees, principals, managers, contractors, attorneys, parents and subsidiaries, related companies, and all persons acting for, with, by, through or under them, have committed activities in Florida that constitute unfair competition with Plaintiff by creating, in Florida, a likelihood of consumer confusion, initial interest confusion and reverse confusion in the trade as to the source or sponsorship of the products or is likely to lead the public to believe Plaintiff is in some way connected to Defendants or Defendants' above-plead infringing actions and are likely to mislead persons in the ordinary course of viewing the Film or purchasing the goods and services of Defendants and induce them to believe they are purchasing or donating to genuine goods and services of Plaintiff, thereby injuring that reputation and goodwill and unjustly diverting from Plaintiff to Defendants the benefits arising therefrom.

225. Defendants' passing off Defendants' goods and services as those of or associated with Plaintiff, and their other unlawful activities described herein which take place in, effect, or contact the State of Florida, constitute unfair competition as proscribed by the common law of Florida and have caused Plaintiff to sustain monetary damage, loss and injury in an amount to be determined at the time of trial.

## COUNT VI

### DECLARATORY JUDGMENT, WRIT OF MANDAMUS, DECREE AND CERTIFIED ORDER TO THE USPTO REGARDING PENDING UNITED STATES TRADEMARK APPLICATION NO. 97699848
**(Prior Use)**

226. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 225, as if fully set forth herein.

227. This claim arises under the federal Lanham Act 15 U.S.C. §1119 for a determination, decree and certified order to the Director of the USPTO and under 28 U.S.C. §§ 2201 and 2202 for a declaratory judgment, declaring that Defendants' pending United States Trademark Application Serial No. 97699848 for the standard character mark **DIED SUDDENLY** should be finally refused and/or canceled, that Defendants are otherwise not entitled to registration therefor, and that the Director of the USPTO shall make an entry upon its records of finally refusing said application and/or cancelling any resulting registration.

228. Plaintiff is the nationwide true and senior user of the Mark **DIED SUDDENLY** in connection with Plaintiff's goods and services, as compared to Defendants' and their use and/or intended use of the confusingly similar mark **DIED SUDDENLY** which is the subject of pending United States Trademark Application Serial No. 97699848 and similar variations thereof.

229. The subject Defendant's Mark, which is the subject of the pending United States Trademark Application Serial No. 97699848, when used in connection with the goods identified and services recited in said application, is likely to be confused with Plaintiff's Mark.

230. Defendants' use of the Mark is being used by Defendants so as to misrepresent the source of the goods and services on or in connection with the Plaintiff's Mark.

231. Notwithstanding Plaintiff's senior use, priority of right, and Defendants' knowledge of Plaintiff and its rightful ownership of the Mark, Defendants filed Application Serial No. 97699848 directed to the standard character word mark **DIED SUDDENLY**, which is likely to be confused with Plaintiff's Mark by consumers and the public.

232. Plaintiff and the public will be damaged if the aforementioned Application matures into a United States trademark registration.

233. This Honorable Court should exercise its authority under 15 U.S.C. §1119 to determine the right to registration and otherwise rectify the trademark register with respect to registrations.

<u>**COUNT VII**</u>

**DECLARATORY JUDGMENT, WRIT OF MANDAMUS, DECREE AND CERTIFIED ORDER TO THE USPTO REGARDING PENDING UNITED STATES TRADEMARK APPLICATION NO. 97699848**
**(Fraud on the United States Patent and Trademark Office)**

234. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 233, as if fully set forth herein.

235. This claim arises under the federal Lanham Act 15 U.S.C. §1119 for a determination, decree and certified order to the Director of the USPTO and under 28 U.S.C. §§ 2201 and 2202 for a declaratory judgment, declaring that Defendants' pending United States Trademark Application Serial No. 97699848 for the standard character mark **DIED SUDDENLY** should be finally refused and/or cancelled, that Defendants are otherwise not entitled to registration therefor, and that the Director of the USPTO shall make an entry upon its records of finally refusing said application and/or cancelling any resulting registration.

236. Plaintiff is the nationwide senior user of the Mark **DIED SUDDENLY** in connection with Plaintiff's goods and services, as compared to Defendants' and their use and/or intended use

of the confusingly similar Defendant's Mark, which is the subject of pending United States Trademark Application Serial No. 97699848 and similar variations thereof.

237. Pursuant to 15 U.S.C. § 1051, Defendants represented to the United States Patent and Trademark office a bona fide intention to use the mark **DIED SUDDENLY.**

238. Pursuant to 15 U.S.C. § 1051, Defendants represented to the USPTO that to the best of their knowledge and belief, no other person has the right to use the mark in United States Trademark Application Serial No. 97699848 in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive.

239. At all times relevant thereto, Defendants knew or should have known of Plaintiff's superior rights in the mark **DIED SUDDENLY.**

240. Defendants knew that the statements made pursuant to Pursuant to 15 U.S.C. § 1051 were false at the time such were made.

241. Defendants intentionally made the aforementioned false statements with intent to deceive the USPTO.

242. Defendants intentionally made the aforementioned false statements with intent to make false claim to Plaintiff's Mark once they knew the Film had gone viral over the Internet.

243. Plaintiff and the public will be damaged if the aforementioned Application matures into a United States trademark registration.

244. This Honorable Court should exercise its authority under 15 U.S.C. §1119 to determine the right to registration and otherwise rectify the trademark register with respect to registrations.

**COUNT VIII**

**CONVERSION OF THE X HANDLE & INFO. SITE**

245. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 244, as if fully set forth herein.

246. Plaintiff is the true and rightful owner of the X Handle and the Info. Site.

247. Creation, maintenance, and assistance of Plaintiff's social media handles and the Info. Site was part of the Network Production and Documentary Production.

248. Creation and posting of social media posts to the X Handle, with Plaintiff's direction, assisted in the promotion of the Film and the goodwill in Plaintiff's Mark.

249. Creation and posting of authorized information to the Info. Site, with Plaintiff's direction and consent, assisted in the promotion of the Film and the goodwill in Plaintiff's Mark.

250. TLM knows, or should know, that Plaintiff retained all rights and ownership in the X Handle and Info. Site.

251. TLM, by posting unauthorized content and solicitations to the X Handle and Info. Site, refusing to provide Plaintiff with proper ownership access of the X Handle and Info. Site, along with the other actions and inaction claimed by Plaintiff herein, has acted in a wrongful manner that is inconsistent with Plaintiff's rights in and to the X Handle and Info. Site.

252. TLM has further acted in a wrongful manner that is inconsistent with TLM's role with, and to, the X Handle, the Info. Site and Network Production and Documentary Production.

253. TLM, at this time, has completely hijacked and converted the X Handle and the Info. Site and continues to post unauthorized content and monetary solicitations.

254. In fact, still to this day, even after both C&D Correspondence, TLM continues to post daily on the X Handle as if there has been no demand by Plaintiff.

255. TLM's wrongful actions and inactions have caused Plaintiff damages.

256. TLM's wrongful actions and inactions amount to a conversion of the X Handle.

## COUNT IX

### TRESPASS TO CHATTEL

### (X Handle and Info. Site)

257. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 256, as if fully set forth herein.

258. Pursuant to the claims and allegations of Plaintiff herein, TLM has wrongfully used, without permission, Plaintiff's property, namely, the X Handle and Info. Site.

259. TLM has refused to provide Plaintiff proper access and ownership of the X Handle and Info. Site, even after Plaintiff's numerous requests.

260. TLM's improper actions and trespass are intentional.

261. TLM actions are an unlawful and are an  unauthorized interference with Plaintiff's right to possession and control of the X Handle and Info. Site.

262. TLM's improper actions amount a trespass to Plaintiff's chattel, namely the X Handle and Info. Site.

## COUNT X

### COPYRIGHT CONVERSION

263. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 262, as if fully set forth herein.

264. Plaintiff is the true and rightful owner/claimant to the Copyright of the Film.

265. Plaintiff hired TLM, as a work-made-for-hire, to assist in the production of the Film.

266. TLM knew, or should have known, that its/their Documentary Production was a work-made-for hire.

267. TLM knew, or should have known, that Plaintiff retained all rights and ownership in the Film.

268. TLM, by registering the Copyright with the United States Copyright Office (the "USCO"), improperly disseminating the Film and/or trailers of the Film, by express and/or implied representations of ownership and control over the Film, by Defendants' unauthorized monetary solicitations that ae being used along with the Film's content, along with the other actions and inaction claimed by Plaintiff herein, has acted in a wrongful manner that is inconsistent with Plaintiff's rights in and to the Film.

269. TLM has further acted in a wrongful manner that is inconsistent with TLM's role with and to the production of the Film.

270. TLM's wrongful actions and inactions have caused Plaintiff damages.

<u>**COUNT XI**</u>

**DECLARATORY JUDGMENT, WRIT OF MANDAMUS, DECREE AND CERTIFIED ORDER TO THE UNITED STATES' COPYRIGHT OFFICE REGARDING COPYRIGHT REGISTRATION PA0002403857 (Fraud and Deception on the United States Copyright Office)**

271. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 270, as if fully set forth herein.

272. TLM represented itself to the USCO as the rightful author and claimant to the Film on its application for Registration No. PA0002403857 the ("Registration").

273. At the time of filing the subject application, TLM knew, or should have known, that its representations to the USCO as sole author and claimant were untrue.

274. At the time of filing the subject application, TLM knew, or should have known, that Plaintiff is the true claimant and owner of the Film.

275. TLM willfully misrepresented its ownership and status to the USCO in order to obtain the subject Registration.

276. This Honorable Court should exercise its authority to determine the right to registration and otherwise rectify the Copyright Register with respect to the rightful owner of the Registration or, in the alternative, to cancel the Registration entirely.

## COUNT XII

### BREACH OF CONTRACT
### (April, 2024 Documentary)

277. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 276, as if fully set forth herein.

278. Plaintiff and TLM entered into a valid agreement regarding Documentary Production for the Second Term's three documentaries.

279. Pursuant to the agreement, TLM was to assist in the production of all three Second Term documentaries.

280. Pursuant to the agreement, all three documentaries were to be produced and released during the Second Term.

281. Pursuant to the agreement, Plaintiff was to pay TLM the Documentary Budget.

282. Plaintiff has done all, or substantially all, of the essential things and obligations Plaintiff was required to do pursuant to the agreement by paying the Documentary Budget to TLM in full.

283. TLM, however, has not provided the services in full which was the crux of the agreement.

284. TLM's communication in its Response Letter to Plaintiff is clear that TLM does not intend on complying with the Documentary Production of the Second Term.

285. TLM's unwillingness to assist in the production of a third Second Term documentary as they have been paid for constitutes a material breach of the agreement.

286. Plaintiff has been damaged by TLM's breach because:

   a. Plaintiff has already paid the full Documentary Budget, a budget that allocates at least $126,333.33 (the "Overpayment") toward the production of the third documentary;

   b. Plaintiff is still required to produce the third documentary pursuant to the Second Term of the GoldCo Sponsorship; and

   c. Plaintiff has been forced to go out into the marketplace and obtain another documentary production outfit to produce and assist in releasing the third documentary.

## COUNT XIII

### BREACH OF CONTRACT
### (Info. Site and X Handle)

287. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 286, as if fully set forth herein.

288. Plaintiff hired TLM for the Network Production and Documentary Production.

289. Plaintiff paid TLM the Weekly Payment for Network Production.

290. Plaintiff paid TLM in lump sum for Documentary Production.

291. As part of the Network Production and Documentary Production, TLM was to set up and maintain, at Plaintiff's direction, the X Handle.

292. As part of the Network Production and Documentary Production, TLM was to set up and maintain, at Plaintiff's direction, the Info. Site.

293. As part of the Network Production and Documentary Production, TLM would assist Plaintiff in the promotion of the Film and dissemination of the Film.

294. The parties entered into a valid agreement regarding the Documentary Production of the Film and use of the Network's media content and other platforms pursuant to the Network Production services.

295. As mentioned herein numerous times, TLM has consistently posted unauthorized content and monetary solicitations on the X Handle and Info. Site.

296. As mentioned herein numerous times, Plaintiff hired the Defendants to assist in disseminating the content of the Film, and directing viewers of the Film, only to authorized content.

297. By posting unauthorized content and monetary solicitations on the X Handle and the Info. Site, TLM has breached the parties' agreement.

298. By directing viewers of the Film and the X Handle Followers to the unauthorized content on the Info. Site, TLM has breached the parties' agreement.

299. By making the misrepresentations on the Info. Site and the X Handle, TLM has breached the parties' agreement.

300. Defendants' breaches of the parties' agreement are material breaches.

301. As described herein and throughout this Complaint, Plaintiff has been damaged by Defendants' breaches.

**<u>COUNT XIV</u>**

**BREACH OF CONTRACT**

47

**(Documentary Production)**

302. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 301, as if fully set forth herein.

303. As plead and described herein, Plaintiff and TLM had an agreement regarding the Documentary Production.

304. TLM, at all times pertinent hereto, was hired by Plaintiff on a work-made-for hire basis.

305. Though the specific words "work-made-for-hire" may have not been formally used in writing, it was an understanding of the Parties that all documentaries produced pursuant to the Documentary Production were to be wholly owned, exclusively, by Plainitff.

306. At all times relevant hereto, upon information and belief, TLM knew, or should have known, that its work on the Documentary Production was a "work-made-for-hire" and that Plaintiff would retain all exclusive right to the audiovisual and motion picture work.

307. Defendants' conduct, or lack of action, regarding the documentaries they have assisted in producing for the Plaintiff other than the Film, is telling of the parties' understanding of the Documentary Production services agreement, prior performance, and course of conduct.

308. The parties have acted consistently on all other documentaries, besides the Film, that TLM has assisted in producing.

309. By seeking to wrongfully claim or obtain ownership in the Film and its audiovisual and motion picture as a work, TLM has breached the contract regarding Documentary Production and Network Production.

310. TLM's breach is a material breach.

311. TLM's breach has caused Plaintiff damages.

**COUNT XV**

**UNJUST ENRICHMENT**

312. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 311, as if fully set forth herein.

313. Alternatively, in the event this Honorable Court does not find a valid agreement between the Parties in relation to the Documentary Production for the Second Term, TLM should not be unjustly enriched by retaining the Overpayment.

314. If an agreement between the parties regarding the Documentary Production for the Second Term is not found by this Honorable Court, the Plaintiff lacks any other adequate remedy at law to recoup the Overpayment.

315. By making the Overpayment to TLM, Plaintiff conferred a substantial benefit to TLM.

316. By receiving and retaining the Overpayment, TLM has appreciated the benefit of the Overpayment.

317. If TLM were able to retain the Overpayment, under the circumstances herein, it would cause a substantial inequity amongst the parties hereto.

318. This Honorable Court should not allow such inequity to stand and order TLM to return the Overpayment to Plaintiff.

**COUNT XVI**

**BREACH OF FIDUCIARY DUTY**
**(Defendant Lauren Witzke)**

319. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 318, as if fully set forth herein.

320. At all times relevant hereto, Witzke was a top-level employee (Executive Producer) of Plaintiff and also, upon information and belief, a principal of TLMG and a Board member of TLMV.

321. By virtue of her high-level employment with Plaintiff, Witzke owed a fiduciary duty to Plaintiff to act in its best interest at all times and to perform her duties in good faith, in a manner consistent with her duties of care and loyalty.

322. Witzke, having been hired to perform duties as Executive Producer of the Network on a day-to-day basis, was in a position of such that Plaintiff depended upon Witzke to act in its best interest.

323. Witzke was obligated to conduct herself in accordance with the applicable standards of care, and she failed to do so.

324. In fact, Witzke not only failed to perform her duties in good faith, she took part in Defendants' infringing and wrongful actions/inactions and began to directly compete with Plaintiff, and misappropriated Plaintiff's opportunities and intellectual property.

325. Examples of Witzke's breaches of her fiduciary duties include, but are not limited to, the following acts:

    a. Engaging in a pattern of infringing activities related to the Film and the Mark, including, without limitation,

        i. Directing public to the unauthorized content on the Info. Site knowing the Info Site had unauthorized misrepresentations and solicitations and assisting in the misrepresentation that Skow and Stumphauzer and/or TLM was the true originator, and "releaser," of the Film and Mark;

ii.  Advertising and disseminating the Film under the Mark and treating the Film as her own, in conjunction with the rest of the Defendants;

iii.   Unauthorized use of the Film and Plaintiff's Mark;

iv.  Along with her co-principals of TLMG, filed with the USPTO an intent-to-use Federal Service Mark Application Serial No. 97699848 for the mark **DIED SUDDENLY,** knowing that TLMG did not have a proper claim or bona fide intent to use the Mark and thereby defrauding the USPTO;

v.  Along with her co-principals and co-Board members of TLMG and TLMV, have refused to provide and grant access to the X Handle and Info. Site that was created for Plaintiff and the Film and by continuing to post unauthorized content on the X Handle and Info. Site even after Plaintiff has forwarded the C&D Correspondence;

vi.  Along with her co-principals of TLMG, applied for Copyright Registration of the Film, while knowing that the true owner of the Copyright is Plaintiff;

vii.  Along with her co-principals and co-Board members of TLMG and TLMV, seeking donations on the Info. Site without Plaintiff's knowledge, consent, or authority;

viii.  Along with her co-principals and co-Board members of TLMG and TLMV, misrepresenting to the general public who visit the Info. Site that Skow and Stumphauzer are in pre-production of Died Suddenly

2, the sequel, and that Skow and Stumphauzer will be the ones to release the sequel;

    ix.  Along with her co-principals and co-Board members of TLMG and TLMV, converting Plaintiff's right to file and register a copyright in the Film; and

    x.  Along with her co-principals and co-Board members of TLMG and TLMV, sought unauthorized solicitations for subscriptions from the X Handle Followers on the X Handle.

b.  Upon information and belief, misappropriating sponsorship funds and/or opportunities that should have benefited Plaintiff but in turn was diverted to Witzke's, and/or TLM's, own endeavors and aspirations;

c.  Along with her co-principals and co-Board members of TLMG and TLMV, misrepresenting to certain podcast hosts and content creators of the Network that such hosts/creators needed to pay an extra fee to TLMG for the production and distribution of their content, knowing that Plaintiff and TLMG already agreed that the Network Production would cover it all; and

d.  Other misconduct outlined in the Termination Letter and the C&D Correspondence.

326. Witzke breached said fiduciary duties that she owed to Plaintiff by putting her own personal interests ahead of Plaintiff's best interest.

327. As a direct and proximate result of Witzke's breaches of her fiduciary duties, Plaintiff has suffered damages.

328. Plaintiff is obligated to the undersigned attorneys for a reasonable fee for services rendered herein.

## COUNT XVII

### INJUNCTIVE RELIEF

329. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 328, as if fully set forth herein.

330. Defendants have not formally responded to the C&D Correspondence.

331. In fact, since the date of the C&D Correspondence, the Defendants have continued all of the herein-mentioned infringing acts, including, but not limited to:

  a. Continued to keep unauthorized content, misrepresentations, and donation solicitations up on the Info. Site;

  b. Continued to promote that they and/or Skow and Stumphauzer are in pre-production of Died Suddenly 2 and they that and/or Skow and Stumphauzer will be releasing Died Suddenly 2;

  c. Continued to consistently post unauthorized content to the X Handle, without authority or consent by Plaintiff and without providing Plaintiff any access or control to the X Handle or Info. Site;

  d. Continued to direct all 690 thousand X Handle followers to the unauthorized content on the Info. Site;

  e. Continued to solicit subscriptions from the X Handle Followers;

  f. Continued to cause Info. Site viewers and X Handle Followers to be confused, hoodwinked, and defrauded as to the origination, and the Network's sponsorship,

of Defendants' misrepresentations and solicitations on the Info. Site and X Handle; and

g.  Have made no efforts to withdraw their intent-to-use Trademark application with Serial No. 97699848 or their Copyright Registration in the Film.

332. Everyday that goes by, the infringing act and the harm done to Plaintiff grows and compounds and the situation necessitates injunctive relief.

333. Unless Defendants are enjoined, Plaintiff will suffer irreparable injury.

334. Plaintiff faces hardship from the consumer confusion and misdirection that are foundational to Defendants' infringing activities.

335. As a result of Defendants' wrongful acts, Plaintiff is unable to control its reputation in the marketplace.

336. By contrast, Defendants face no hardship if they are enjoined from continuing their wrongful acts, especially those that are illegal.

337. Therefore, an award of monetary damages would not cure the injury to Plaintiff's reputation, business, and goodwill that will further decay if Defendants' wrongful actions are not enjoined.

338. Plaintiff has no other adequate remedy at law.

339. The balance of hardship favors an equitable remedy in Plaintiff's favor.

340. An issuance of an injunction is in the public's interest to prevent Plaintiff's consumers from being misled by Defendants; wrongful actions.

**WHEREFORE**, Plaintiff prays for relief against the Defendants, as to all counts above, as follows:

A. An order immediately and preliminarily enjoining and restraining, during the pendency of this action, and thereafter permanently enjoining and restraining Defendants, their agents, servants, employees, attorneys, parents and subsidiaries, related companies, and all persons acting for, with, by, through or under them, and each of them from:

    a. Using the mark **DIED SUDDENLY** or any name, term, or mark similar thereto or any confusingly similar designation alone or in combination with other terms, as a trademark, slogan, tag line, trade name component or otherwise, as a domain name, sub-domain, directory name, email address or other such computer addresses, as the name of Defendants' websites, as part of a URL, metatag, hashtag, Ad Words, or, in any other way to market, advertise, sell, offer for sale or identify Defendants' goods, services, or advertisements;

    b. Otherwise infringing on Plaintiff's Mark by employing the name, terms or phrase **DIED SUDDENLY**  therein;

    c. Unfairly competing with Plaintiff in any manner whatsoever; and

    d. Causing a likelihood of confusion, or other injury to Plaintiff's business reputation by any unauthorized use of the same.

B. An order requiring Defendants to deliver and destroy all devices, websites, domains, computer hardware and software, files, menus, hard drives, servers, diskettes and backups, literature, advertisements, packages, labels, signs, prints, wrappers, receptacles, and all other materials and products in the possession of Defendants or under control, bearing the name and/or mark **DIED SUDDENLY** in or on them.

C. An order requiring Defendants to notify, in writing, and direct to their internet service provider(s), web host(s) and all publishers of directories or lists, including Internet search

engines, in which the Defendants' use of the names and marks employing **DIED SUDDENLY** appear, to delete all references to said names and marks from their public databases, search engine directories, directory assistance and from all future directories in which said names and marks are to appear, and to delete all forwarding or "cache memory" or storage mechanisms referencing names and marks employing the mark **DIED SUDDENLY**

D. An order requiring Defendants to file with the Court, and serve upon Plaintiff's counsel, within thirty (30) days after entry of judgment, a report, in writing, and under oath, setting forth, in detail, the manner and form in which Defendants have complied with the requirements of the injunction and order.

E. An order requiring Defendants to pay over to Plaintiff all profits realized directly or indirectly by Defendants, directly or indirectly related to the infringing products and services, the sales of which have been enhanced directly or indirectly, or advertising of same, or otherwise by reason of Defendants' unlawful acts alleged herein, and that such amounts be trebled pursuant to 15 U.S.C. § 1117(a)(3) or as otherwise provided by law.

F. A declaratory judgment, writ of mandamus, decree and certified order to the Director of the USPTO declaring that TLMG's U.S. Trademark Application Serial No. Serial No. 97699848 to the USPTO's Principal Register for the mark **DIED SUDDENLY** should be finally refused, that any resulting registration should be cancelled, that Defendant is otherwise not entitled to registration therefor and that the register of the USPTO should reflect same. An enhancement of any monetary award based on profits which this Court, in its discretion, finds just pursuant to 15 U.S.C. §§ 1117, 1118, or as otherwise provided by law.

G. A declaratory judgment, writ of mandamus, decree and certified order to the United States Copyright Register declaring that TLMG's Copyright Registration No. PA0002403857 should be cancelled, that the Defendants are not other entitled to registration therefor and that the Copyright Register should reflect same. An enhancement of any monetary aware based on profits which this Court, in its discretion, funds just or as otherwise provided by the law.

H. An order enjoining the Defendants from further dilution of Plaintiff's Mark and any damages Plaintiff has incurred associated with Defendants' diluting actions.

I. An order requiring the Defendants to return all control and ownership over the X Handle and the Info. Site and/or an award of monetary damages from the conversion and/or trespass of same.

J. An order requiring TLMG to transfer and assign to Plaintiff, or cancel, its Copyright Registration for the Film, Registration No. PA0002403857.

K. An order

L. An award of monetary damages.

M. An award of punitive and exemplary damages.

N. Plaintiff to have and recover its reasonable attorney's fees incurred in this litigation.

O. Plaintiff to have and recover its taxable costs and other costs, expenses and disbursement incurred herein.

P. Prejudgment and post-judgment interest on all monetary awards.

Q. Plaintiff to have such other and further relief as this Honorable Court may deem just and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury for all issues so triable.

Dated: April 3, 2024

PLAINTIFF,
FOKISS, Inc. d/b/a the Stew Peters Network
By and through its undersigned counsel:


*/s/ Travis J. DeCosta, Esq.*
**Travis J. DeCosta, Esq.**
**DeCosta Law**
Fla. Bar No.: 1034322
Email: Travis@DeCostaFirm.com
T. (401) 243-3954
2066 14th Ave, Ste 101
Vero Beach, FL 32960