UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-cv-14096-KMM

FOKISS, INC.,
*doing business as*
STEW PETERS NETWORK,

      Plaintiff,

v.

TLM GLOBAL, LLC, *et al*.

      Defendants.

_____/

## ORDER

THIS CAUSE came before the Court upon the Report and Recommendation of the Honorable Ryon M. McCabe, United States Magistrate Judge.  ("R&R") (ECF No. 156).  On August 7, 2024, Defendants/Counterclaimants filed a Motion for Preliminary Injunction.  (ECF No. 77).  On August 16, 2024, Plaintiff/Counterdefendants filed a Motion for Preliminary Injunction.  (ECF No. 84)  The Court referred the cross-motions for Preliminary Injunction to the Honorable Ryon M. McCabe, United States Magistrate Judge, to take all necessary and proper action as required by law and/or to issue a Report and Recommendation.  (ECF Nos. 78, 85).  On December 9, 2024, Magistrate Judge McCabe issued the R&R recommending that Defendants/Counterclaimants' Motion for Preliminary Injunction be GRANTED, and that Plaintiff/Counterdefendants' Motion for Preliminary Injunction be DENIED.  *See generally* R&R. Plaintiff/Counterdefendants filed Objections to the R&R.  ("Objs.") (ECF No. 166). Defendants/Counterclaimants filed a response to the Objections.  ("Resp.") (ECF No. 167). Plaintiff/Counterdefendants did not file a reply.  The matter is now ripe for review.  As set forth below, the Court ADOPTS the R&R.

## I.      BACKGROUND

This case stems from a dispute between Plaintiff/Counterdefendants Fokiss, Inc. d/b/a Stew Peters Network and Stew Peters (collectively, "Fokiss")[1] and Defendants/Counterclaimants TLM Global, LLC, TLM Vision, Inc., Edward Szall ("Szall"), Lauren Witzke ("Witzke"), Matthew Skow ("Skow"), and Nicholas Stumphauzer ("Stumphauzer") (collectively, "TLM Global") over the copyright and trademark ownership of the documentary film, "Died Suddenly" (the "Film" or "Died Suddenly"). *See* R&R at 2–6.  Fokiss is a Minnesota based digital media organization that is founded and owned by Stew Peters.  *Id.* at 2.  Fokiss produces the Stew Peters Show which discusses political topics and is available on multiple digital platforms, including, but not limited to, Fokiss's Rumble channel, its X (formerly known as Twitter) handle, AppleTV, and Gettr.com. *Id.*; FAC at 29.  TLM Global is a Florida based media company that creates documentary films. *Id.*  Szall, Witzke, and Skow are owners/members of TLM Global, and Stumphauzer is an employee of TLM Global.  *Id.*

In or around October 2021, Fokiss entered into a verbal contract with TLM Global to have TLM Global produce four documentary films for a total sum of $360,000.  *Id.*  Skow and Stumphauzer had primary responsibility for writing, producing, and creating the documentary films. *Id.* at 3.  The Parties contemplated that Fokiss would present the documentary films through its various media outlets and social media platforms.  *Id.*  The Parties never entered into a written contract that addressed the scope of work performed or ownership rights of any intellectual property associated with the documentary films.  *Id.* at 3.  The instant action centers around one

---

[1] While this case was brought by one Plaintiff, Fokiss, Inc. d/b/a Stew Peters Network, Defendants in their counterclaim bring their claims against both Fokiss, Inc. and Stew Peters.  *See* ("FAC") (ECF No. 50); ("Counterclaims") (ECF No. 66).  To avoid confusion and since Stew Peters is the CEO and founder of Fokiss, Inc., the Court will refer to them collectively as "Fokiss."  *See* FAC at 5.

of the documentary films, Died Suddenly.  *See generally id.*  The other three documentary films are not at issue in this dispute.  *Id.* at 3.

In or around August or September 2022, Skow and Stumphauzer began working on Died Suddenly.  *Id.*  The Film explores perceived dangers of taking the COVID-19 vaccine including the mysterious deaths of people who were vaccinated.  *Id.*  The Film credits identify Skow and Stumphauzer as having "written, produced, directed, filmed and edited" the Film.  *Id.*  The Film credits identify Fokiss as one of the "Producers" of the Film.  *Id.*  The Film premiered on November 22, 2022, and has since generated over 20 million views.  *Id.*  The Film could be streamed on several media outlets, including on Fokiss's Rumble channel and on the X handle "@DiedSuddenly."  *Id.*  The X handle was created by TLM Global.  *Id.*  On December 1, 2022, TLM Global filed an "intent-to-use" trademark application for Died Suddenly with the U.S. Patent and Trademark Office.  *Id.* at 4.  On February 3, 2023, TLM Global registered a copyright for the Film with the U.S. Copyright Office.  *Id.*

Throughout 2023, the Parties fought over control of the Film, its website, and its X handle.  *Id.*  On January 27, 2024, Fokiss sent TLM Global a letter titled, "Business Contract Termination Letter," which stated that Fokiss was terminating its business relationship with TLM Global.  *Id.*  The letter cited TLM Global's trademark application and registered copyright for Died Suddenly as one of the reasons for the termination, and Fokiss asserted that it owned the rights to Died Suddenly.  *Id.*  On March 20, 2024, Fokiss filed its own trademark application for the name Died Suddenly.  *Id.*

On April 3, 2024, Fokiss brought the instant Action against TLM Global.  *Id.*; (ECF No. 1).  On June 6, 2024, Fokiss filed its First Amended Complaint asserting seventeen claims:[2]

---

[2] Counts I through VI were brought against all Defendants, Counts VII through VIII were brought against all Defendants besides TLM Vision, Inc., and Counts IX through XII and XIV through

Federal Unfair Competition False Endorsement & Designation of Origin, 15 U.S.C. § 1125(a); Florida Common Law Trademark Infringement; Florida Deceptive Unfair Trade Practices Act, Fla. Stat. § 501.201-213, *et seq.*; Florida Common Law Unfair Competition; Conversion of the X Handle & Info. Site; Trespass to Chattel (X Handle & Info. Site); Copyright Conversion; Declaratory Judgment, Writ of Mandamus, Decree and Certified Order to the United States' Copyright Office Regarding Copyright Registration PA0002403857 (Fraud and Deception on the United States Copyright Office); Breach of Contract (April 2024 Documentary); Unjust Enrichment; Breach of Contract (Info. Site and X Handle); Breach of Contract (Documentary Production of the Film); Breach of Fiduciary Duty (against Witzke); Breach of Fiduciary Duty (against TLM Global); Breach of Contract (Network Equipment and Property); Conversion (Network Equipment and Property); and Trespass to Chattel (Network Equipment and Property). *See generally* FAC.

On July 25, 2024, TLM Global filed a counterclaim asserting seven claims against both Fokiss and Stew Peters: Copyright Infringement under 17 U.S.C. § 101, *et. seq.*; False Designation of Origin under 15 U.S.C. § 1125(a), *et. seq.*; Unfair Competition under Florida Law; Florida Deceptive and Unfair Trade Practices, Fla. Stat. § 501.201 *et. seq.*; Unjust Enrichment under Florida Law; Declaratory Judgment that the Fraudulent Copyright Registrations are Invalid and Should be Canceled; and Declaratory Judgment that the Fraudulent Trademark Application is Invalid and Should be Withdrawn. *See generally* Counterclaims.

On August 7, 2024, TLM Global filed a Motion for Preliminary Injunction, (ECF No. 77), and on August 18, 2024, Fokiss filed its Motion for Preliminary Injunction, (ECF No. 84). Magistrate Judge McCabe held a multi-day hearing on the cross motions for Preliminary

---

XVII were brought against TLM Global. *See generally* FAC. Count XIII was brought against Witzke alone. *Id.*

Injunction.  *See* (ECF Nos. 131, 135, 140).  As set forth in the R&R, Magistrate Judge McCabe recommends that the Court grant TLM Global's Motion for Preliminary Injunction and deny Fokiss's Motion for Preliminary Injunction.  *See generally* R&R.  Fokiss objects to Magistrate Judge McCabe's findings.  *See generally* Objs.

## II.   LEGAL STANDARD

The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The Court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  A *de novo* review is therefore required if a party files "a proper, specific objection" to a factual finding contained in the report.  *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).  "It is critical that the objection be sufficiently specific and not a general objection to the report" to warrant *de novo* review.  *Id.*

Yet when a party has failed to object or has not properly objected to the magistrate judge's findings, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *See Keaton v. United States*, No. 14-21230-CIV, 2015 WL 12780912, at *1 (S.D. Fla. May 4, 2015); *see also Lopez v. Berryhill*, No. 17-CV-24263, 2019 WL 2254704, at *2 (S.D. Fla. Feb. 26, 2019) (stating that a district judge "evaluate[s] portions of the R & R not objected to under a clearly erroneous standard of review" (citing *Davis v. Apfel*, 93 F. Supp. 2d 1313, 1317 (M.D. Fla. 2000))).

## III.   DISCUSSION

As set forth in the R&R, Magistrate Judge McCabe recommends that the Court grant TLM Global's Motion for Preliminary Injunction and deny Fokiss's Motion for Preliminary Injunction. *See* R&R at 1.  In doing so, Magistrate Judge McCabe found that TLM Global met each of the Eleventh Circuit's prerequisites for the granting of a preliminary injunction.  *See generally id.*

Fokiss's Objections consist of both generalized grievances with the R&R's factual and legal conclusions, as well as proper, specific objections to the R&R's findings. *See generally* Objs. Where the objections are proper, the Court reviews the R&R's findings *de novo*. *Macort*, 208 F. App'x at 784. Where Plaintiff makes an improper objection or raises no objection at all, the Court reviews the R&R for clear error. *Lopez*, 2019 WL 2254704, at * 2. To the extent the Objections take issue with Magistrate Judge McCabe's recital of the background information, *see* Objs. at 4–6, after a review of the available record, the Court agrees with Magistrate Judge McCabe's understanding of the case. Those objections are overruled. To the extent that Fokiss's factual objections affect properly objected to legal determinations made in the R&R, the Court addresses them below.[3]

### A. Preliminary Injunction Standard

Pursuant to Federal Rule of Civil Procedure 65(a), the Court may enter a preliminary injunction "to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (quoting *Am. Radio Ass'n v. Mobile S.S. Ass'n, Inc.*, 483 F.2d 1, 4 (5th Cir. 1973)). Before a court grants a preliminary injunction, the moving party must establish four conditions: (1) a substantial likelihood of success on the merits; (2) a showing that the movant will suffer irreparable injury if an injunction does not issue; (3) proof that the threatened injury to the movant outweighs any harm that might result to the non-moving party; and (4) a showing that

---

[3] As mentioned, Magistrate Judge McCabe held a multi-day hearing on the cross-motions for Preliminary Injunction. Federal Rule of Civil Procedure 72(b) requires a party objecting to a magistrate judge's recommended disposition of a referred motion to "promptly arrange for transcribing the record." Fed. R. Civ. P. 72(b)(2). Here, Fokiss has only provided an excerpt of the hearing transcript, the direct testimony of Stew Peters. *See* (ECF Nos. 132, 166-Ex. 1). Where Fokiss's objections dispute that certain statements were made in contradiction to Magistrate Judge McCabe's findings, and where Fokiss offers no citation for support, the Court defers to Magistrate Judge McCabe's findings.

the public interest will not be disserved by the granting of a preliminary injunction. *See id.* at 1284–85 (citing *Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir. 1987)).  The "[f]ailure to show any of the four factors is fatal" to a motion for a preliminary injunction. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

**B.  Analysis**

Finding that TLM Global satisfied its burden as to each of the four factors, the R&R recommends that the Court grant TLM Global's Motion for Preliminary Injunction. *See generally* R&R.  Fokiss offers multiple objections. *See generally* Objs.  The Court summarizes the R&R's findings, analyzes each factor necessary to grant a preliminary injunction, and considers Fokiss's objections in turn.

*i.  Substantial Likelihood of Success on the Merits*

For purposes of the cross-motions for Preliminary Injunction, the R&R boiled down the numerous claims and counterclaims the Parties have alleged against one another to three legal issues: (1) ownership of the copyright to Died Suddenly; (2) implied license to use the copyright to Died Suddenly; and (3) ownership of the trademark of Died Suddenly.  R&R at 7.  The R&R concludes that TLM Global is substantially likely to prevail on each issue. *See id.* at 7–17.

Fokiss makes the following objections to the R&R's conclusion that TLM Global has a substantial likelihood of success on the merits regarding the above three legal issues: (1) TLM Global did not show a substantial likelihood of prevailing on the issue that Fokiss was not a joint author of the copyright under 17 U.S.C. § 201(a); (2) the R&R fails to consider an irrevocable implied license, contrary to *Hermosilla v. Coca Cola*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010), *aff'd sub nom.*, *Hermosilla v. Coca-Cola*, 419 F. App'x 917 (11th Cir. 2011); (3) the R&R fails to make a finding of TLM Global's creation of secondary meaning which is necessary to establish

7

trademark rights in a single-title work; and (4) TLM Global's abandonment of trademark rights through naked licensing undermines the R&R's conclusions.  Objs. at 6–18.

### a. Ownership of the Copyright to Died Suddenly

First at issue is whether Fokiss and TLM Global may be considered co-authors of the Film. The R&R found that "the evidence is substantially likely to show that Skow and Stumphauzer qualify as the initial authors [of] the film for purposes of 17 U.S.C. § 201(a)[.]" and that while Fokiss "may have made contributions" to Died Suddenly, those contributions are "insufficient to demonstrate a substantial likelihood of success on a theory of joint authorship under 17 U.S.C. § 201(a)."  R&R at 8.  Fokiss objects to this finding and argues that Fokiss's "contributions to the to the Film—including the generation of ideas, years of dedicated research, the scripting of Mr. Peters' own speaking roles (whether or not subsequently edited out by Defendants), the drafting of interview questions, and the creation of video interviews with the same specialists featured in the Stew Peters Show and later in the documentary Film," are sufficient to make Fokiss a joint author of the Film's copyright.  Objs. at 7.

Under the Copyright Act, initial ownership of a copyright is vested "in the author or authors of the work[,]" and "authors of a joint work are coowners of copyright in the work."  17 U.S.C. § 201(a).  A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.  17 U.S.C. § 101.  "The parties do not cite nor is the Court aware of applicable Eleventh Circuit precedent that interprets the Copyright Act's 'joint work' definition and related provisions that have a bearing on co-authorship. Therefore, the Court looks to the law of other circuits that have analyzed co-authorship claims."  *Seventh Chakra Films, LLC v. Alesse*, 666 F. Supp. 3d 1250, 1262 (S.D. Fla. 2023).

Both the Second and Seventh Circuits have held that the party claiming co-authorship "bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998) (citing *Childress v. Taylor*, 945 F.2d 500, 507–08 (2d Cir. 1991)); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994). The Ninth Circuit has also laid out various factors to analyze whether the parties intended to be co-authors and co-authorship exists in the context of a motion picture production and in the absence of a contract. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000). "First, an author superintends the work by exercising control." *Id.* ("This will likely be a person who has actually formed the picture . . . or [is] the inventive or master mind who creates or gives effect to the idea.") (citations omitted). Second, co-authors "make objective manifestations of a shared intent to be coauthors[.]" *Id.* Subjective intent is not considered. *See id.* "Third, the audience appeal of the work turns on both contributions and the share of each in its success cannot be appraised." *Id.* (citations omitted).

Applying the above factors to the instant Action, where there was no written contract between the Parties stating whether the Parties intended to be or not to be co-authors, the Court finds that the evidence does not support a determination that Fokiss was a co-author of the Film. *See Aalmuhammed*, 202 F.3d at 1235 ("The factors articulated in this decision and the Second and Seventh Circuit decisions cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much."). Skow and Stumphauzer, TLM Global's owner/member and employee respectively, had artistic control of Died Suddenly, and the Film's credits identify Skow and Stumphauzer as having "written, produced, directed, filmed and edited" the Film. ("PI Exs.") (ECF No. 139) at Ex. 5. While Fokiss states it made "contributions to the Film," including "the generation of ideas [and] years of dedicated research[,]" Objs. at 7, "ideas and suggestions cannot

9

be copyrighted until they are fixed in a medium of expression." *Seventh Chakra Films, LLC*, 666 F. Supp. 3d at 1265.  Additionally, while Fokiss states it drafted interview questions and helped with the creation of video interviews, Objs. at 7, Fokiss testified at the Preliminary Injunction hearing that "[t]hose interviews were not incorporated into the film." (Excerpt Testimony of Stew Peters) (ECF No. 132) at 59; *see also Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) (finding that the contribution of a fourteen-page original, creative, copyrightable story which became part of the motion picture at issue in the case did not give the authors of the story co-author status to the motion picture because the authors of the story did not supervise the movie by exercising control, nor was there mutual intent that the authors of the story would be co-authors of the motion picture); *Aalmuhammed,* 202 F.3d at 1235 ("What Aalmuhammed's evidence showed, and all it showed, was that, subject to Spike Lee's authority to accept them, he made very valuable contributions to the movie. That is not enough for co-authorship of a joint work.").  Fokiss also does not deny that TLM Global had final decision-making power and retained control over the final content of the Film.  *See* Objs.; *Seventh Chakra Films, LLC*, 666 F. Supp. 3d at 1263–64.

Further, there were no objective manifestations of a shared intent to be coauthors made between Fokiss and Skow and Stumphauzer.  *See Aalmuhammed*, 202 F.3d at 1234.  As mentioned, the Film's credits provide an objective manifestation that Skow and Stumphauzer were the authors of the Film.  In its Objections, Fokiss argues that "evidence during the time of the release was introduced showing that, at the very least, Defendant Skow had the intent to co-produce the Film with Plaintiff." Objs. at 8 (citing ECF No. 151) at Ex. 31).  Fokiss points to a text message between it and Skow, where Skow states that Fokiss was "perfect in [the Film]" and that Skow is proud to "partner with" Fokiss.  *Id.*  However, the Court does not see how this is an objective manifestation of a shared intent to be co-authors.  *See Aalmuhammed*, 202 F.3d at 1234.  It shows that Fokiss

was in the Film and that Fokiss and Skow worked together, but that is not the same as being co-authors under copyright law. *See id.* ("The broader construction that [plaintiff] proposes would extend joint authorship to many "overreaching contributors," . . . and deny sole authors "exclusive authorship status simply because another person render[ed] some form of assistance[,]" which would "endanger authors."). Accordingly, Fokiss's objection is overruled.

The R&R also analyzed authorship and copyright ownership under the "Works Made for Hire" doctrine. *See* R&R at 8–15; 17 U.S.C. § 201(b).[4] The R&R concluded, "[b]ased on the evidence adduced at the hearing, and after considering all of the *Reid* factors," that Fokiss was not an author of Died Suddenly under the doctrine. *See id.*; *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Fokiss made no proper, specific objections to this finding, and the Court finds no clear error with the R&R's conclusion.

### b. *Implied License to Use the Copyright to Died Suddenly*

The R&R next found that TLM Global was substantially likely to prevail on the issue of whether Fokiss had an implied license to use the copyright to Died Suddenly, as "[t]o the extent an implied license existed, TLM Global terminated it based on breach of the license." R&R at 14–15.

"An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). An implied license need not be in writing. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir.

---

[4] "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

2009). An implied license is revocable unless and until consideration is accepted by the licensor. *Hermosilla*, 717 F. Supp. 2d at 1303.

Fokiss argues that the R&R failed to consider this Court's holding in *Hermosilla*, and argues that since consideration was received here, the implied license was irrevocable. Objs. at 10–13 ("Adoption of the R&R's findings regarding the implied license in question requires that this Court reverse itself and contravene the Eleventh Circuit's binding principle."). Fokiss's objection is without merit. This Court's holding in *Hermosilla*, where there was no material breach alleged, does not address the relevant issue here, which is what happens to an implied license when there is a material breach. This is the inquiry that the R&R correctly focuses on. *See* R&R at 15–16. The fact that consideration was exchanged here is not disputed. *See generally* R&R; Resp.

Even if consideration is exchanged, "Eleventh Circuit precedent suggests that a material breach of the parties' oral understanding may entitle the licensor to revoke its permission for future use of the copyrighted materials." R&R at 15 (citing *Wenger v. Brooklyn Water Ent., LLC*, No. 16-81019, 2016 WL 8709992, at *3 (S.D. Fla. Oct. 11, 2016)) (citing *Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997)). "[A]n implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered." *Latimer v. Roaring Toyz*, Inc., 601 F.3d 1224, 1235 (11th Cir. 2010).

On May 28, 2024, after Fokiss filed this Action, TLM Global sent a letter entitled "Termination of Implied License and Cease and Desist to SPN" to Fokiss. *See* (the "Letter") (ECF No. 139-23). The Letter states that TLM Global is terminating Fokiss's implied license to make use of the Film due to Fokiss's material breach of the license which was based on restrictions to the scope of the license placed by TLM Global at the time the work was delivered. *See id.*; Resp.

at 15–18.[5]   TLM Global states, as testified to in the Preliminary Injunction hearing, that it "expressly informed [Fokiss] that [its] use of the Film was restricted to its subject matter – exposing the mysterious deaths surrounding the COVID-19 vaccine and highlighting the perceived danger of taking the vaccine."  Resp. at 17.

The Letter points to various alleged "flagrant misuses of and misrepresentations" of the Film by Fokiss, as examples that Fokiss "far exceeded the scope of its implied license."  Letter at 4.   These include Fokiss using the Film in its "social media, including on X, to advertise and promote an 'extreme accountability' tour, which has been defined by Mr. Peters as events to promote the killing of federal and elected officials by 'firing squad, guillotine, or hanging by rope.'"  *Id.* at 2–3.   The Letter specifies that Fokiss, in its promotional video for the extreme accountability tour, includes scenes from Died Suddenly, "next to images of guillotines and [its] call[] for extreme accountability."  *Id.* at 3.   Additionally, Fokiss cites the "alleged damage from the COVID-19 vaccine, the subject of . . . Died Suddenly, as justification for these public executions of federal officers and elected officials" that Fokiss deems guilty of "'crimes against humanity.'"  *Id.*

Accordingly, the Court agrees with the R&R that TLM Global is substantially likely to prevail on the issue of an implied license—that to the extent an implied license existed, TLM Global terminated it based on a material breach of the scope of the license as outlined in the Letter. Fokiss's objection is overruled.

### c. Ownership of the Trademark

Fokiss and TLM Global each claim trademark ownership of the Film's title, "Died Suddenly," and each submitted a trademark application for the name.  *See* R&R at 4.  The R&R

---

[5] Fokiss, in its Objections, states that "the R&R finds that there were no restrictions whatsoever placed on [Fokiss]."  Objs. at 11.  However, the R&R does not state this, and the Court warns Fokiss against mischaracterizing Magistrate Judge McCabe's finding and misleading the Court.

concludes that TLM Global is substantially likely to prevail on its claim of ownership of the trademark based on the same underlying reasons the R&R concluded that TLM Global is substantially likely to prevail on its claim of ownership of the copyright. *Id.* at 16–17. Fokiss objects on two grounds. Objs. at 13–18. First, that the R&R fails to make a finding of TLM Global's creation of secondary meaning which is necessary to establish trademark rights in a single-title work, and second, that TLM Global's abandonment of its trademark rights through naked licensing undermines the R&R's conclusions. *Id.*

Regarding its first objection, Fokiss argues that the R&R "fails to analyze the specific activities that constitute trademark infringement, as well as the critical issues of secondary meaning and consumer perception[,]" and that by "omitting these necessary issues, the R&R misapplies the required legal standards to support its conclusion." *Id.* at 17. However, this objection mischaracterizes the R&R's findings and the relevant inquiry.

"To be a valid trademark a non-inherently distinctive designation must have that amount of strength called 'secondary meaning.'" § 11:82. 1 McCarthy on Trademarks and Unfair Competition § 11:82 (5th ed.). Here, the debate is not over whether "Died Suddenly" is a valid trademark, as both Parties believe they own a valid trademark to "Died Suddenly." The relevant question is who has ownership of that trademark. As Magistrate Judge McCabe notes, "[t]his is not a case where two opposing parties seek to use the same or similar trademarks to promote two different products, creating a risk of confusion in the marketplace." R&R at 17. Instead, here, "the opposing parties seek to use the exact same trademark, i.e., the word "Died Suddenly," to promote the exact same product, i.e., the documentary film of that same name." *Id.* As such, Magistrate Judge McCabe's finding that TLM Global's ownership of the trademark flows from its underlying ownership of the copyright is sound. *See id.* at 16–17 ("'[a] reasonable rule of thumb is that the required association (between a motion picture title and its source) be with the owner of

14

copyright in the literary work, since the owner is the one who can control use of the expressive work'") (quoting § 10:10, 1 McCarthy on Trademarks and Unfair Competition (5th ed.)). Accordingly, Fokiss's objection is overruled.

Regarding its second objection, Fokiss argues that the R&R fails to address whether TLM Global abandoned its trademark rights through naked licensing practices. Objs. at 17–18. An "owner of a trademark may 'abandon his mark through naked licensing, or the failure to properly supervise his licensee's use of the mark.'" *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1356 (S.D. Fla. 2017) (quoting *Nguyen v. Biondo*, 508 Fed. Appx. 932, 935 (11th Cir. 2013) (cleaned up). "[T]he claim of abandonment 'turns on when the lack of supervision occurred.'" *Id.*

As discussed above, Fokiss argued that it had an irrevocable implied license to use Died Suddenly, *see* Section III.B.i.b. However, as this Court has noted, the Eleventh Circuit has explicitly held that a licensee is estopped from contesting the validity of the licensor's title during the course of the licensing arrangement. *See Casa Dimitri Corp.*, 270 F. Supp. 3d at 1356 (citing *Nguyen*, 508 Fed. Appx. at 935). While the Court found that any implied license was revocable upon breach, Fokiss is estopped from contesting the validity of the licensor's, TLM Global, title while the implied license was in effect. *See id.* Fokiss may contest the validity of TLM Global's title on facts which arose after the agreement ended, which in this case would be after TLM Global sent Fokiss the Letter. *See id.* But Fokiss does not do so in its objections. *See* Objs. 17–18. Accordingly, Fokiss's objection is overruled.

### ii. *Irreparable Harm*

The Court now moves to the second condition the moving party must establish before a court grants a preliminary injunction: a showing that the movant will suffer irreparably injury if an injunction does not issue. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d

at 1284.  The R&R concludes that TLM Global faces irreparable harm in the form of reputation damage and negative publicity if a preliminary injunction is not issued against Fokiss.  R&R at 18. The R&R's conclusion is based on Fokiss's "extreme and offensive rhetoric on social media and other platforms[,]" where Fokiss simultaneously and conjointly promoted Died Suddenly.  *Id.* Fokiss objects.  It states that the "R&R erroneously concludes that Defendants have suffered irreparable harm where none exists" and that the Middle District of Florida cases cited by the R&R to support its finding of irreparable harm are distinguishable from the instant Action.  Objs. at 18– 20; *see also Nane Jan, LLC v. Seasalt & Pepper, LLC*, No. 2:14–cv–208–FtM–29CM, 2014 WL 5177655, at *7 (M.D. Fla. Oct. 14, 2014); *Shell Oil Co. v. Altina Associates, Inc.*, 866 F. Supp. 536, 541–42 (M.D. Fla.1994).

An injury is "irreparable" only if it cannot be undone through monetary remedies.  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285.  The R&R cites to the courts' holdings in *Nane Jan, LLC* and *Shell Oil Co.* for the proposition that "courts have recognized irreparable harm where the movant faces a risk of reputational damage and negative publicity based on improper use of intellectual property" that was difficult to quantify.  R&R at 18; *Nane Jan, LLC*, 2014 WL 5177655, at *7; *Shell Oil Co.*, 866 F. Supp. at 541–42.

The Court will first address the content publicly posted by Fokiss that the R&R deemed could cause TLM Global irreparably harm, and the Court will next address Fokiss's arguments regarding the differences between the instant Action and the Middle District of Florida cases cited in the R&R.

The R&R includes multiple examples of what it considers "extreme rhetoric" that led to TLM Global facing irreparably injury by having its intellectual property, Died Suddenly, associated with the rhetoric.  R&R at 18–19.  For example, Fokiss, while having the Died Suddenly

movie poster pinned to its X handle[6] or having it as a pinned post on its other social media accounts,[7] posted the following: the U.S. Women's Soccer Team are "[t]hese fudgepacking, pillow-biting Hershey highway butt bandits [and] are always the perverts that target our kids for grooming and pedophilia[]"; Martin Luther King, Jr. was a "plagiarizer, drunkard, woman beater and serial adulterer" who "engaged in numerous unnatural sex acts and violent sex orgies with prostitutes[]"; an article entitled, "Stew Peters: Border Wall Should be Armed with 'AI Powered' Guns so that Migrants 'Get Shot in the Brain[]" along with the caption, "This shouldn't be controversial"; and an image of Stew Peters holding *Mein Kampf* by Adolf Hitler with the caption, "Visionary leadership." *Id.*; PI Exs. at Exs. 24, 42–44. Additionally, as referenced above, Fokiss used Died Suddenly to promote its Extreme Accountability tour which advocated "killing federal elected officials by firing squad, guillotine, and hanging." R&R at 15–16; PI Exs. at Exs. 18–19.

The R&R concluded that based on the above content, in addition to other social media posts by Fokiss, that it would be difficult, if not impossible, to quantify the damage to TLM Global by being associated with said content. R&R at 19. Fokiss claims that TLM Global could not have suffered reputational injury based on the referenced content because the "target audience" for Died Suddenly "aligns with that of" Fokiss's target audience. Objs. at 20. However, Fokiss provides no support for that contention, and the Court will not make the finding that an audience interested in a film about the alleged damage caused by the COVID-19 vaccine is also an audience that is automatically interested in content bashing the U.S. Women's Soccer Team, Martin Luther King, Jr., migrants, the Jewish people, federal officials, and others.

---

[6] The X handle at issue is in the name of Stew Peters: "@realstewpeters."

[7] The Preliminary Injunction Hearing Exhibits show that on platforms where Fokiss pinned the post about Died Suddenly, the pinned post would then appear in view when a viewer was looking at any other posts made by Fokiss on the platforms. *See e.g.*, PI Exs. at Exs. 18, 58.

Next, the Court turns to Fokiss's arguments regarding the differences between the instant Action and the Middle District of Florida cases cited in the R&R.  Fokiss argues that the case *Nane Jan, LLC* is distinguishable because, there, the moving party provided "clear evidence of negative publicity directly tied to trademark confusion," and TLM Global has not done so here.  Objs. at 19.  Fokiss also claims that the case *Shell Oil Co.* is distinguishable because, there, "irreparable harm arose from criminal charges involving a franchisee, which risked damaging the reputation of Shell's trademark," where here, the alleged irreparable harm arises from Fokiss's statements of opinion which the R&R deemed "harmful rhetoric."  *Id.* at 19–20.  Fokiss emphasizes that "no evidence has been presented to suggest that any consumers expressed any concerns about Defendants' reputation related to Peter's exercise of free speech."  *Id.* at 20.

In its Response, TLM Global refutes the allegation that it has not provided evidence of negative repercussions to its business and reputation from Fokiss frequently associating its "statements of opinion" with Died Suddenly.[8]  *See* Resp. at 21.  TLM Global also states that at the hearing, its witnesses specifically identified "instances of reputation harm and lost business opportunities, including [loss of] clients such as Coldco and The Wellness Co, who refused to do business with [TLM Global] because of negative brand association with Peters."  *Id.*  Accordingly, TLM Global has showed that it suffered concrete economic and reputational injuries.  *See Nane Jan, LLC*, 2014 WL 5177655, at *7; *Shell Oil Co.*, 866 F. Supp. at 541-42; *see also Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190–91 (11th Cir. 2005) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.") (citation omitted).

---

[8] TLM Global specifically states that: "Judge McCabe listened to many hours of testimony observing Peters promoting not just himself, but his company Fokiss associating extreme rhetoric with the brand. Numerous examples where he used Died Suddenly to promote hateful rhetoric were introduced into evidence. See, e.g., DE 139-58 (antisemitic film "Occupied"); DE 149, Ex. Q (video associating Died Suddenly film award with Extreme Accountability rhetoric); DE 139-18 (noose); 139-20 (gallows)."  Resp. at 21.

Therefore, the Court agrees with the R&R's conclusion that "it would be difficult if not impossible to calculate the monetary damages arising from the association of proprietary intellectual property with this rhetoric." R&R at 19. Fokiss's objections are overruled.

### iii. Balance of Harms

The R&R finds that TLM Global has met its burden of showing that the balance of harms favors entry of a preliminary injunction in its favor. *Id.* at 20. Fokiss objects, arguing that the balance of harms weighs in favor of Fokiss who "risks losing its reputation and the goodwill it cultivated through its expense of time and resources in participating in the creation and hard costs in the heavy promotion of the Film." Objs. at 20. Fokiss does not explain further, nor does the Court see, how Fokiss risks losing its reputation if it can no longer promote the Film. Fokiss also states that it "invested $360,000 in producing the 'Died Suddenly' Film and stands to lose that amount along with the costs associated with three other films." *Id.*

Contrary to Fokiss's intent, its alleged quantifiable monetary loss supports a finding that the balance of harms weighs in favor of TLM Global who has claimed it suffers irreparable injuries that cannot be undone by money damages. *See* R&R at 20 ("As previously discussed, this reputational damage may be so severe as to be incapable of compensation through monetary damages.").

Fokiss has provided no evidence of actions by TLM Global that have caused it specific harm or may cause it harm in the future, besides lost time and resources. As the Court noted, that is not enough to tip the balance of harms to weigh in Fokiss's favor. Accordingly, Fokiss's objection is overruled.

### iv. Public Interest

The R&R lastly finds that TLM Global has satisfied its burden of showing that a preliminary injunction would not be adverse to the public interest. *Id.* The R&R concludes that

the public interest "supports entry of a preliminary injunction to avoid misleading consumers into believing that Fokiss owns, controls, or otherwise has permission to make use of the Died Suddenly film." *Id.* Fokiss does not object to this finding. *See generally* Objs. As such, the Court reviews the finding for clear error and does not find a clear error with the R&R's conclusion. *See Macort*, 208 Fed. Appx. at 784.

## IV.     CONCLUSION

Accordingly, UPON CONSIDERATION of the cross-motions for Preliminary Injunction, the R&R, the Objections and Response, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Report and Recommendation (ECF No. 156) is ADOPTED.   Defendants/Counterclaimants' Motion for Preliminary Injunction (ECF No. 77) is GRANTED.   Plaintiff/Counterdefendants' Motion for Preliminary Injunction (ECF No. 84) is DENIED.

It is further ORDERED AND ADJUDGED that

1. This Preliminary Injunction applies to Fokiss, Inc. d/b/a Stew Peters Network, as well as its owners, officers, employees, and attorneys (hereafter collectively "Fokiss").

2. Pursuant to Fed. R. Civ. P. 65(a), Fokiss is hereby preliminarily enjoined from:

(a) using segments of the "Died Suddenly" film and/or the title to advertise, promote, or market the Extreme Accountability Tour, whether in promotional videos, posters, social media, on propaganda, or elsewhere;

(b) presenting the "Died Suddenly" film on Rumble or otherwise on its network;

(c) advertising, marketing, or promoting the "Died Suddenly" film or its title;

(d) copying, reproducing, publishing, distributing, and/or making derivative works, including sequels, of the "Died Suddenly" film;

(e) advertising, marketing, promoting, and/or offering or selling products or services under the "Died Suddenly" mark;

(f) using or promoting "Died Suddenly" in or on any social media, websites, or advertisements; and

(g) otherwise representing that they are associated or affiliated with the "Died Suddenly" film.

3. TLM Global, LLC shall maintain its bond in the amount of $10,000 during the pendency of this action, or until further Order of the Court;

4. This Preliminary Injunction shall remain in effect during the pendency of this action, or until such further date as set by the Court or stipulated to by the parties.


DONE AND ORDERED in Chambers at Miami, Florida, this __31st__ day of January, 2025.


_____
K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record